UNITED STATES of America, Plaintiff-Appellee,

v.

Oscar ORDONEZ, German Hernandez-Garcia, aka Jaime Rivera, Defendants-Appellants.

Nos. 82–1506, 82–1508.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 1983.

Decided Dec. 23, 1983.

**532**

George L. O'Connell, Los Angeles, Cal., for plaintiff-appellee.

Stanley I. Greenberg, Joseph T. Vodnoy, Los Angeles, Cal., for defendants-appellants.

Before ALARCON and NORRIS, Circuit Judges, and EAST *, District Judge.

ALARCON, Circuit Judge:

German Hernandez-Garcia, also known as Jaime Rivera, and Oscar Ordonez were each found guilty of conspiracy to possess and distribute cocaine (21 U.S.C. § 846) and two counts of possession of cocaine with the intent to distribute it (21 U.S.C. § 841(a)(1) (Count 2 and Count 7). Ordonez was found guilty of an additional count of possession of cocaine with the intent to distribute it (Count 2) and of the crime of occupying the position of organizer, supervisor, or manager of a continuing criminal enterprise (21 U.S.C. § 848) (Count 14).

We must decide whether entries in a ledger were admissible to prove (1) the existence of a conspiracy or acts in furtherance thereof, (2) the corpus delicti of the crime of possession of cocaine with intent to distribute it, and (3) that a person is a leader of a continuing criminal enterprise, where the identity of the person who made the notation in the record is unknown. We have concluded that the entries were inad-

* Hon. William G. East, Senior United States District Judge for the District of Oregon, sitting by

missible to prove the truth of the matter asserted. Accordingly, we must reverse the possession and continuing criminal enterprise charges because the government failed to prove essential elements of these offenses with admissible evidence. We reverse the conspiracy charge because of the prejudicial impact of the inadmissible ledger entries on the jury's fact finding function.

We have set forth the facts in considerable detail to assess the effect of the court's erroneous evidentiary rulings on the fairness of the trial.

## I.

### FACTUAL BACKGROUND

A. *Pertinent Facts Presented at Trial*

Surveillance by law enforcement officers of several locations in Southwest Los Angeles began in late September, 1981. This investigation ultimately focused on three houses: Marina Bay Drive, Palm Street and Norwalk Boulevard. Police observed numerous persons transporting packages between the locations. German Hernandez-Garcia was observed twice during the pre-arrest stage of the investigation; once at the Palm Street residence and on another occasion at a bar accompanied by several co-defendants. On October 30, 1981 a search was conducted at the three residences. Ordonez was arrested at the residence on Marina Bay Drive. The officers seized several ledgers containing entries in Spanish. The search also disclosed narcotics paraphernalia, $350,000 in cash, five Colombian passports, and some immigration forms. German Hernandez-Garcia's wife was sitting next to a suitcase which contained the $385,000 at the time of the seizure. She was not arrested. One of the passports was issued to German Hernandez-Garcia. The immigration forms were addressed to Ordonez at his Sunland residence.

designation.

On the same date, German Hernandez-Garcia approached the Palm Street residence, after the officers had entered pursuant to the search warrant. The officers pulled German Hernandez-Garcia inside the house. Approximately four kilograms of cocaine and $16,000 in United States currency were seized at the Palm Street house. Additional ledgers were found at this location. Dental records in the names of Mr. and Mrs. J. Rivera were also found. Business records from the dentist's office reflected a $7,500 cash payment for Mrs. Rivera's treatment.

The officers also found narcotics paraphernalia at the Norwalk Boulevard residence. During the search at this location, the telephone rang. One caller asked to speak to "Jaime". This caller ordered one kilo of cocaine. Another caller asked to speak to "Jaime, my brother", and gave Sanchez an address on Pioneer Street where the caller could be located. Sanchez later went to that address where he arrested Antonio Hernandez, German Hernandez-Garcia's brother. The government asked the jury to infer that the caller's statements were proof that Hernandez-Garcia was known as "Jaime".

Ordonez was listed as one of the lessees on each of the three homes searched. The utility bills for these residences were also in his name. The total rent paid each month exceeded several thousand dollars; $2,500 for Marina Bay Drive, $700 for Norwalk Boulevard, and $500 for Palm Street. These payments were usually made by Ordonez in cash. The government argued to the jury that Ordonez received substantial income from the cocaine transactions because the high monthly rental payments necessarily reflected an increase in his earnings from previous years. Ordonez' tax returns for 1976–1979 showed an average annual income of only $27,000. Ordonez introduced someone as "Jaime Rivera" to Mr. Wright, a manager of the Marina Bay Drive property. Mr. Wright testified that this individual was *not* German Hernandez-Garcia.

Over defense objection, the ledgers seized during the search were admitted into evidence. The trial court ruled outside the presence of the jury, that the ledgers were admissible under the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). The trial court did not give any special instructions limiting the use of this evidence at the time it was received, or throughout the course of the trial.

Frank, a handwriting and fingerprint expert, testified that a majority of the entries on the ledgers were made by at least four unidentified persons.

In Frank's opinion five fingerprints were left on the ledgers by German Hernandez-Garcia. Ordonez left one fingerprint identifiable. Ordonez' handwriting appeared on several pages. German Hernandez-Garcia's handwriting was not found on any of the entries.

Drug Enforcement Agent Larry Lyons was qualified as an expert witness on "Colombian cocaine organizations" and the "interpretation of the books and records of narcotics organizations." Lyons testified that the entries in the ledger were in a code which required interpretation by an expert with his experience and qualifications. Lyons told the jury that in his opinion, the ledgers consisted of working papers, ledger cards, a record of funds paid to members of the organization, a master ledger, a cocaine distribution ledger and a money flow ledger. According to Lyons, the ledgers recorded the cocaine transactions of an organization from late 1980 through September 1981.

Lyons also testified that in his opinion, the ledgers were business records made in the regular course of business, which reflected daily cocaine transactions including deliveries made to numerous individuals. These records were necessary to keep track of the large quantity of narcotics and cash exchanged. Lyons also stated that the coded entries reflected precisely the known wholesale prices of cocaine.

The entries made in Ordonez' handwriting appeared in one notebook and on two separate cards which, Lyons believed, were

part of the money flow ledger and master ledger.

Lyons testified that the names "Oscar" and "Jaime" appeared in numerous ledger entries. He stated that the three variations of the name "Oscar" referred to Ordonez and the six variations of the name "Jaime" referred primarily to German Hernandez-Garcia." He testified, however, that the name "Jaime" also referred to several other persons. According to Lyons, the entry for March 4, 1981, as decoded, indicated "arrived five kilos brought by Jaime and Oscar."

Lyons construed this as indicating that Ordonez and Hernandez-Garcia possessed 11 pounds of cocaine with the intent to distribute on that date. This testimony was used to support the allegations in Count 7 of the indictment. The ledgers were also used to prove that Ordonez possessed 48.4 pounds of cocaine with intent to distribute on June 15, 1981, as charged in Count 11. No other evidence was offered in support of these charges. No one testified that he saw Ordonez or Hernandez-Garcia in possession of cocaine on these dates.

The government argued to the jury that several entries cumulatively established that Ordonez possessed cocaine on June 15, 1981. None of the ledger entries, however, specifically referred to a transaction on that date.

## II.

## DISCUSSION

### A. *Admissibility of the Ledgers*

Ordonez and Hernandez-Garcia contend that the ledgers and the expert testimony offered to interpret the coded entries were inadmissible. We agree. Before the trial court the government argued that the entries in the ledgers were admissible as statements of co-conspirators pursuant to Fed.R.Evid. 801(d)(2). The district court found that the ledgers were sufficiently trustworthy to be received in evidence because a proper foundation had been presented to show that the entries were reliable business records. "We do have tes-timony from an expert, Special Agent Larry Lyons indicating that the business records were extensive and absolutely required in this nature of business or type of business and there was exactness required in terms of the contraband transaction ..."

Later, however, the trial court ruled that the ledgers were admissible as admissions. The court found "sufficient independent evidence to establish the trustworthiness of the admissions ... with respect to the substantive possession counts." It is our view that the requisite foundational facts were not presented by the government to support admissibility of the entries in the ledgers as (1) admissions, (2) statements of co-conspirator or (3) trustworthy as business records.

### 1. *Foundational Requirement for Admissions*

The statement of a party opponent is admissible if it is "his own statement either in his individual or representative capacity." Fed.R.Evid. 801(d)(2)(A). No evidence was presented that the entries upon which the entries for March 4, 1981 and June 15, 1981 were the statements of either appellant.

■ The government's sole proof of the crime of possession of cocaine for distribution as charged in Counts 7 and 11 was based on the ledger entries. The government's handwriting expert could not identify the author of the entries for these dates. At oral argument the government conceded that the persons who made these entries were not identified at trial. Thus, the ledgers and the testimony interpreting their meaning were not admissible as the admissions of a party.

### 2. *Foundational Requirement for Co-Conspirator's Statements*

■ A statement by a co-conspirator during the course of and in furtherance of a "conspiracy" is admissible into evidence under Fed.R.Evid. 801(d)(2)(E). Ordonez and Hernandez-Garcia argue that the entries were not admissible as declarations of a co-conspirator because the declarant was never identified. They also assert that ad-

mission of the ledger entries under these circumstances, violates the Confrontation Clause of the Sixth Amendment. Where an accused claims that an out-of-court statement was received into evidence in violation of the Confrontation Clause, the record must show that the government produced the declarant or presented facts showing that such person was unavailable. *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). In this matter, the court admitted the ledger entries although the government was not able to identify the person who made the entries for March 4 and June 15. *No evidence was offered that these unidentified persons were not available to testify at trial.*

■ Thus, Ordonez and Hernandez-Garcia were convicted of substantive counts of possession of cocaine for distribution based on the out of court assertions of unidentified persons who were never subjected to confrontation or cross-examination and whose unavailability was never demonstrated. The use of this evidence clearly violated the first prong of the test set forth in *Ohio v. Roberts.* "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable." 448 U.S. at 66, 100 S.Ct. at 2539.

■ The submission of the ledger entries to the jury under these circumstances also failed to comply with the second aspect of the Supreme Court's test for the admissibility of extrajudicial statements set forth in *Ohio v. Roberts.* Once the declarant is shown to be unavailable, the government must prove that the declarant's assertions are trustworthy. 448 U.S. at 65, 100 S.Ct. at 2538–39. "Reliability can be inferred without more in a case where the evidence fails within a firmly rooted hearsay exception." 448 U.S. at 66, 100 S.Ct. at 2539. In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Supreme Court "[did] not question the validity of the co-conspirator exception applied in the federal courts." 400 U.S. at 80, 91 S.Ct. at 215. The Court found no violation of the Confrontation Clause in the use of a co-conspir-

ator's statement under Georgia's rule which admits assertions which evidence an attempt to conceal the offense. In determining whether the Confrontation Clause has been violated where a co-conspirator's statement is offered, a trial court must determine if the circumstances under which the statements were made present a sufficient "indicia of reliability" so that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970).

In *Dutton v. Evans,* the Court tested the reliability of a co-conspirator's statement under four indicia:

1. Did the statement contain assertion of past fact?

2. Did the declarant have personal knowledge of the facts he related?

3. Did the government's evidence exclude the possibility that declarant acted upon a faulty recollection?

4. Did the circumstances under which the assertion was made provide any reason to believe that the declarant misrepresented the truth? 400 U.S. 88–89, 91 S.Ct. at 219–220.

In the instant matter, the government failed to present any evidence to demonstrate the reliability of the entries in the ledger under the criteria set forth in *Dutton.*

First. We cannot determine from the ledger entry whether the declarant recorded past fact or present fact.

Second. The government failed to present any evidence from which it can be determined whether the declarant had personal knowledge of the facts he recorded.

Three. Because the declarant was not identified, the trier of fact could not determine whether the entries reflected clear or faulty recollection.

Four. No evidence was offered by the government to show that the declarant's statements were truthful.

The government failed to lay a proper foundation for the admission of the entries. These statements were admitted into evidence in violation of the Confrontation Clause.

### 3. *Foundational Requirements for Admissibility of Business Records*

The government also argues that the ledger entries were business records which provide "substantial evidence corroborating the admissions contained in the ledgers." The government appears to be arguing as follows:

1. The ledger entries are business records.

2. Business records are trustworthy.

3. The ledger entries contain admissions in addition to a record of daily business transactions.

4. Therefore, the ledger entries are admissible as business records to corroborate any admissions they contain.

The only authority cited for this novel proposition is *United States v. Licavoli*, 604 F.2d 613 (9th Cir.1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).

*Licavoli* is inapposite. There, the Court affirmed the conviction of an art gallery owner for the theft of a valuable painting. One issue on appeal was whether an art appraisal was erroneously admitted into evidence under the business records exception. Fed.R.Evid. 803(6). The appellant did not argue that the government failed to establish the foundational requirements of this hearsay exception. Rather, he contended that the appraiser did not qualify as an expert witness pursuant to Fed.R.Evid. 702 and that the business records exception did not dispense with the expert witness requirements. The court disagreed. The Court reasoned that there was no need affirmatively to establish the appraisers expert qualifications because "Rule 803(6) expressly provides for the exclusion of a business record if the source of information indicates a lack of trustworthiness." *Id.* at

622. *Licavoli* simply did not address the issues before us.

The government's argument in support of admissibility is based on the false premise that the ledger entries qualify as business records. A hearsay statement is admissible as a business record pursuant to Fed.R. Evid. 803(6) if the following foundational facts are proved:

1. The writing is made or transmitted by a person with knowledge at or near the time of the incident recorded.

2. The record is kept in the course of regularly conducted business activity.

These facts must be shown by the testimony of the custodian or other qualified witness.

The record will not be admissible, however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

■ The government failed to comply with the requirement of the business records exception to the hearsay rule.

The government did not produce the custodian of the records as a witness. No evidence was offered by any person that the records were kept by persons having personal knowledge of the facts recorded or that the entries were made at or near the time of the transaction. No evidence was presented to demonstrate that the persons who made the entries were truthful and had a clear recollection of the facts. The entries were made by many persons, some of them unidentified. The expert's opinion that these entries were business records was not supported by the foundational evidence required by Fed.R.Evid. 803(6).

The government failed to show that evidence of the ledger entries "falls within [the foundational requirements] of a firmly rooted hearsay exception." *Ohio v. Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. The ledger entries were inadmissible as proof of the matter asserted for all of the reasons discussed above.

## B. *Prejudicial Effect of Evidence of Ledger Entries*

### 1. *Counts 7 and 11*

■ We have concluded that the ledger entries were inadmissible under the Confrontation Clause as proof of the matter asserted because the government failed to demonstrate (1) the unavailability of the unidentified declarants, (2) the trustworthiness of their statements, and (3) the existence of the requisite foundational facts for admission under any exception to the hearsay rule.

The government forthrightly conceded at trial that without the ledger entries, it could not prove that Ordonez and German Hernandez-Garcia were guilty of possession of cocaine for distribution as charged in Counts 7 and 11. We agree. Because the ledger entries were inadmissible as proof that appellants possessed cocaine for distribution, we must reverse Counts 7 and 11. There was no legally admissible evidence of their guilt of these crimes.

### 2. *Continuing Criminal Enterprise*

■ We are also compelled to reverse Count 14, which charged Ordonez with occupying the position of an organizer, supervisor or manager of a continuing criminal enterprise in violation of 21 U.S.C. § 848. A person is engaged in a continuing criminal enterprise if he (1) commits a felony as defined in subchapter I or II of Chapter 13 of Title 21, and (2) "such violation is part of a continuing series of violations." 21 U.S.C. § 848(b)(1) and (2). The term "series" as used in § 848 refers to "three or more federal narcotics law violations." *United States v. Valenzuela*, 596 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979). At least two of the three narcotics law violations required to prove a violation of § 848—Counts 7 and 11—were based on the expert's interpretation of the ledger entries. As discussed above, this evidence was inadmissible under the Confrontation Clause when offered to prove the truth of matter asserted. No other legally sufficient evidence was offered that Ordonez had committed a series of narcotics law violations. That portion of the judgment which is dependent on proof of a violation of section 848 cannot stand.

### 3. *Conspiracy*

The government relied heavily on the expert's interpretation of the ledger entries to prove that Ordonez and German Hernandez-Garcia were guilty of conspiracy. Lyons testified that it was his "opinion that these records document the distribution of cocaine in very large quantities from late in 1980 and continuing on through September of 1981. They also document the movement of money that was paid for the cocaine. They also document some of the expenses incurred by the organization, and they document the payments made to members of the organizations."

In closing argument, the government fully exploited the evidence based on the ledger entries. The prosecutor told the jury "we have additional substantial evidence that there was a conspiracy, there was an organization, and those are the ledgers that you've heard so much about."

■ For the reasons set forth above, the ledger entries were not admissible to prove the existence of a conspiracy. The use of this evidence to prove the truth of the statements contained in the ledger violated the Confrontation Clause. Where there is a reasonable possibility that the admission of evidence in violation of the Confrontation Clause might have contributed to a conviction, the government has the burden of persuading an appellate court beyond a reasonable doubt that such error was harmless. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059–61, 31 L.Ed.2d 340 (1972); *United States v. Valle-Valdez*, 554 F.2d 911, 915 (9th Cir.1977). The ledger entries were characterized by the government's expert witness as the business records of a highly sophisticated international organization engaged in the distribution of cocaine. It is clear that this evidence, if true and admissible, conclusively proved the existence of a conspiracy. It was, therefore, highly preju-

dicial to the accused. It is possible that the evidence may have been sufficient to convince the jury of the existence of a conspiracy, had the ledger entries not been admitted. We cannot say, however, that we are convinced beyond a reasonable doubt that the court's error in admitting the ledger entries was harmless. The prosecutor urged the jury to consider the statements in the entries as "substantial evidence" that a conspiracy existed. If the jury was persuaded by the government's argument concerning the weight they should give to the ledger entries, then it is very likely that this evidence contributed to the jury's finding that Ordonez and German Hernandez-Garcia were guilty of conspiracy.

Ordonez and German Hernandez-Garcia were entitled to a trial free from the improper admission of highly prejudicial evidence. It is evident to us from our independent review of this record that the admission of the ledger entries was not harmless error.

### 4. *Count 2*

German Hernandez-Garcia and Ordonez were convicted of Count 2 which charged them with possession with intent to distribute 8.8 pounds of cocaine seized during the October 30, 1982 search of the Palm Street residence. Ordonez was arrested elsewhere. The evidence disclosed that German Hernandez-Garcia did not live at the Palm Street house. In fact, the government argued successfully before the district court that German Hernandez-Garcia and Ordonez lacked standing to challenge the search of the Palm Street residence.

As Hernandez-Garcia approached the house during the search he was pulled inside by one of the officers conducting the search. Thus, there was no evidence that Hernandez-Garcia and Ordonez had actual or constructive possession of the cocaine found during the search. They were convicted of Count 2 under a conspiracy theory. A member of the conspiracy can be convicted of any substantive crime committed by a co-conspirator during the course and in fur-

therance of a conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946). We have determined that the conviction of each appellant for conspiracy must be reversed because prejudicial error was committed by the court in admitting evidence in violation of the Confrontation Clause. We must reverse Count 2 for the same reason. The convictions of appellants under Count 2 were also obtained through prejudicial exploitation of constitutional error.

### C. *Informer's Identity*

Hernandez-Garcia and Ordonez also seek reversal of the district court's order denying disclosure of the identity of the person whose information triggered the investigation which precipitated this prosecution.

In support of their motion for disclosure of the informer's identity, appellant's relied upon the affidavit of Los Angeles Police Officer Roberto B. Sanchez filed in support of the search warrant issued in this matter. Officer Sanchez alleged that on or about October 7, 1981 he received information from a confidential, reliable informer that "Jaime" was a major cocaine dealer who was presently selling large amounts of cocaine. Jaime had sold cocaine to the informer on ten occasions within the previous 60 days. The informer gave Officer Sanchez Jaime's telephone number. The telephone number was registered to Tito Lago, at 18617 South Norwalk Boulevard, Artesia, California. Officer Sanchez observed the person who entered the residence at this address. He obtained photographs of these individuals and showed them to the informer. The informer identified Antonio Hernandez as the person he knew as Jaime.

German Hernandez-Garcia, who uses the name Jaime Rivera, contends that the refusal of the court to disclose the identity of the informer was a denial of due process. He argues that based on Officer Sanchez' affidavit, the informer would have been a material witness to bolster his defense of mistaken identity.[1] The informer would

---

1. The record discloses that many persons suspected of being connected with the cocaine

have been called to testify that Antonio Hernandez was the person known as "Jaime" who was involved with an organization which sold cocaine.

Ordonez asserts that the informer would have been a material witness to his defense to Count 14. It is Ordonez' position that the informer would have supported his theory that his role in the organization was menial and not that of a supervisor, manager, or organizer as alleged in the continuing criminal enterprise charge. Officer Sanchez' affidavit established that the informer knew the leaders of the enterprise, as well as its inner workings, hierarchy, and memberships. It is Ordonez' position that, based on the allegations in the affidavit, the informer would have testified that Jaime (Antonio Hernandez) was the leader of the organization.

The government opposed the motion for disclosure of the informer's identity. Affidavits from two law enforcement officers were submitted to the court for in camera review. We have read these affidavits. Neither contains any facts which address the factual questions raised by appellants. There were no facts in the affidavits sub-

mitted in camera which establish that German Hernandez-Garcia was the "Jaime" who was a major cocaine dealer who sold narcotics to the informer or that Ordonez, and not some other person, was the leader of the organization.

After reviewing this material, the district court stated:

> With respect to the disclosure and production of the informants, it is a balancing task, and defense counsel did articulate quite well the particular need for the disclosure. However, the information received in camera involves a strong concern for the public interest as well as the safety of that individual and that motion likewise will be denied.

The court's order is not clear. The court apparently concluded that German Hernandez-Garcia and Ordonez made a sufficient showing, based on Officer Sanchez' affidavit in support of the search warrant, that the informer's testimony would have been helpful to their defense. The court made no finding on the materiality of the informer's potential testimony after reviewing the government's in camera submission. As

distribution organization used the name "Jaime". The following portion of the transcript is illustrative of this phenomenon:

VODNOY: Q. First of all, would it be fair to say that we have the name, Jaime?

LYONS: A. Yes, just the name, Jaime.

Q. Is there also a Jaime H.?

A. Yes, there is.

Q. Was there also a Jaime Salsa?

A. Yes, there is.

Q. Was there also a Jaime Toto?

A. A—

Q. Agent Lyons?

A. I am looking for that one.

Q. Jaime Toto?

A. Yes, there is.

Q. You found it?

A. Yes.

Q. Was there also a Primo Jaime, if you will look?

A. I believe so, yes.

Q. There are five variations I have on the Board here with the name, Jaime.

Is there any other than you came across other than one of these five?

A. There was also Jaime Hoinjer. There was a Jaime Medico.

Q. Is that a name?

A. Well, it is not a name, really.

Q. I am asking for names that you think are reasonable names or which stand for a name.

A. I think that is all I can remember at the moment or find.

Q. In your expert opinion are all one, two, three, four, five, six of these names referring to one person?

A. No, I don't believe they do.

Q. Is, for example, Jaime Toto the same as Jaime or Jaime H.?

A. I do not believe it is the same person.

Q. Is Jaime, Primo Jaime the same as Jaime Toto?

A. I do not believe it is.

Q. I take it that Primo Jaime would not be the same as Jaime or Jaime H.?

A. That is correct.

Q. So that at least at a minimum there are three Jaime's on that list, is that correct, three different people?

A. That is correct.

Q. Did you find the name, Jaime R., in any of the books and records?

A. Not that I can recall.

Q. Did you find the name, Jaime River, first and last name, on any of the books and records?

A. No, I did not.

noted above, it is evident from our independent review of these materials that no facts were presented by the government which demonstrate that the informer would not be helpful to the defense. Thus, appellant's showing of materiality remains unrefuted.

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court held that where the government opposes disclosure of the identity of an informer, a trial judge must balance the public interest in protecting the flow of information against the individual's right to prepare his defense. 353 U.S. at 62, 77 S.Ct. at 628–29. The Court declined to formulate a fixed rule to be applied with respect to disclosure. Instead, the Court stated: "Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 62, 77 S.Ct. at 628–29.

We cannot determine from the trial court's brief comments whether these factors were given their proper weight. Articulation of these factors in express findings in disclosure cases would facilitate the work of reviewing court and avoid unnecessary reversals. The balancing task imposed on trial courts by *Roviaro* is critical to the preservation of due process. The Supreme Court has instructed us that: "[w]here the disclosure of an informer's identity, or of the contents of his communcation, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 628.

We cannot discern from this record why the district court determined that the privilege *must not* give way under the circumstances of this case. If the district court believed that disclosure was relevant and helpful to the defense of the appellants, it was error of constitutional dimension to deny disclosure solely because of the potential danger to the informer. If disclosure is essential to a fair determination of the case

"the trial court may require disclosure, and, if the government withholds the information, dismiss the action." 353 U.S. at 61, 77 S.Ct. at 628.

Because of the inadequacy of this record, we cannot determine whether the trial court balanced the competing interests of the parties as required by *Roviaro.* A complete record of the trial court's findings on an informant disclosure motion may require application of the *Roviaro* balancing test to the facts of the case. *See United States v. Fischer,* 531 F.2d 783 (5th Cir.1976) (remanded with instructions to make such a record following interview of the informer and government counsel). In fairness to both sides, we must vacate the trial court's order denying disclosure, to avoid application of the law of the case doctrine. This question must be remanded for de novo proceedings in the event of a new trial.

We recognize that the conduct of in camera proceedings, where disclosure is requested, is left to the discretion of the trial court. We are also mindful of the extraordinary deviation from the customary safeguards provided by the Confrontation Clause and the adversary system which results from a reliance on in camera proceedings which are conducted in the absence of the defendant and his counsel. During an in camera hearing, the district court is thrust into the unaccustomed responsibility of serving as a surrogate advocate for the defendant without being aware of his confidential communications or able to seek his advice as to which questions may reveal matters helpful to the defense.

Judge McGlaughlin of the Third Circuit expressed this dilemma as follows:

[A] trial judge is not privy to the activities or cognition of an informer and unless the court is aided by evidence . . . it must indulge in a judicial guessing game and rule in favor of one interest at the possible expense of the other.

*United States v. Day,* 384 F.2d 464, 470 (3d Cir.1967) (McGlaughlin, J., concurring).

The procedure selected by the trial court should provide a substantial equivalent to

the rights available to a criminal defendant under the fifth and sixth amendment.

In the instant matter the informer was not produced for interrogation by the court. Counsel for the accused were not allowed to be present nor were they requested to submit questions for the assistance of the court in testing the memory and credibility of the informer. Instead, the trial court relied on hearsay statements and the factual conclusions of an officer who had spoken to the informer at some unspecified time. Officer Sanchez' affidavit is silent as to whether the informer had been asked if German Hernandez-Garcia was the "Jaime" the major cocaine dealer from whom he had purchased cocaine ten separate times. No reference to Ordonez appears in Officer Sanchez' affidavit. The government's submission to the court for in camera review failed to address the issue of most concern to the accused. Did the informer possess information which would have been helpful and relevant to the presentation of a defense?

This court has noted that interrogation of the informer by the court is an appropriate means of accommodating the due process interests of the defendant and the government's concern for the safety of the informer. *United States v. Anderson,* 509 F.2d 724, 730 (9th Cir.), *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975). In *United States v. Moore,* 522 F.2d 1068 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976), we commented on the importance of the presentation of the informer for interrogation by the trial court as follows: "Through disclosure of the informant's identity to the trial judge, and such subsequent inquiries by the judge as may be necessary, the Government can be protected from any significant, unnecessary impairment of necessary secrecy, yet the defendant can be saved from what could be serious police misconduct." 522 F.2d at 1073.

In the *Anderson* case we also suggested that the trial court should give consideration to defense counsel's participation. "[T]he trial judge, in the exercise of his discretion, can conduct an in camera hearing to which the defense counsel, but not the defendant, is admitted. The defense counsel could then be permitted to participate in the in camera proceedings and to cross-examine the in camera witness or witnesses." 509 F.2d at 729.

Requiring the informer to appear at an in camera hearing was approved in *United States v. Jackson,* 384 F.2d 825 (3d Cir. 1967), *cert. denied,* 392 U.S. 933, 88 S.Ct. 2294, 20 L.Ed.2d 1391 (1968) in the following language: "The advantage of the procedure is that it enables the court to view with a keener perspective the factual circumstances upon which it must rule and attaches to the court's ruling a more abiding sense of fairness than could otherwise have been realized." 384 F.2d at 827.

To insure that the informer is subjected to a vigorous or searching examination, some trial courts have permitted defense counsel to submit a set of questions to be propounded by the court. *United States v. Rawlinson,* 487 F.2d 5 (9th Cir.1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1579, 39 L.Ed.2d 881 (1974); *see also United States v. Long,* 533 F.2d 505 (9th Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976).

We do not intend to prescribe the in camera procedure to be followed by the district court in this matter in the event of a retrial. Instead, we have suggested alternative procedures which will assist the court in meeting the responsibility imposed by *Roviaro* and the due process clause.

The procedure followed by the district court in this matter did not produce sufficient trustworthy evidence to permit this court to decide that the informer's testimony would not have been helpful to the appellants. The order denying disclosure must be vacated.

D.  *Interception of Telephone Calls*

During the search of the Norwalk premises, an officer answered incoming telephone calls. One caller ordered a kilo of cocaine. Ordonez alleges that the interception of these telephone calls was improper

and beyond the scope of the search warrant. We disagree. In *United States v. Gallo,* 659 F.2d 110 (9th Cir.1981), we held that an officer may intercept telephone calls while executing a search warrant if the calls are reasonably related to the purpose of the search. 659 F.2d at 114. We held in *Gallo* that the search warrant need not specifically authorize telephonic interceptions where the telephone is "highly necessary" to the illicit business conducted on the premises. *Id.* at 114. In *Gallo* we were concerned with telephone calls made to a bookmaking establishment. It is clear to us that the telephone is highly necessary to an unlawful organization selling cocaine out of private residences. No error occurred in admitting evidence of the incoming telephone calls.

### E. Suppression of German Hernandez-Garcia's Statements

German Hernandez-Garcia contends that the district court committed reversible error in denying his motion to suppress statements made at the Palm Street residence. He argues in his opening brief that "any statements made by the appellant prior to his being advised of his *Miranda* rights should have been suppressed by the district court." On May 25, 1982, the district court filed a written order suppressing "all statements made prior to the defendant [German Hernandez-Garcia] being advised of his *Miranda* rights..." The appellant is mistaken as to the state of the record.

### F. Admissibility of the Tax Return

Ordonez complains of the admission of his tax returns for the years 1976 through 1979. We review evidentiary rulings to determine if the district court abused its discretion. *United States v. Kahan & Lessin Co.,* 695 F.2d 1122 (9th Cir. 1982). We find no abuse of discretion. The tax returns showed an annual income of between $18,000 and $26,000. The jury could properly infer from this evidence that the large sums paid on house rentals in 1981 must have come from an illegal source.

### G. Validity of the Search Warrant

German Hernandez-Garcia and Ordonez also challenge the district court's determination that the affidavit in support of the search warrant contained sufficient facts to establish probable cause. This contention lacks merit.

We are satisfied from our review of the affidavit that it meets the requirements of *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The affidavit discloses that the police received information concerning a large scale cocaine distributing organization from a reliable informant which was based on his personal knowledge. This information was independently verified by police surveillance. The totality of the circumstances known to the officers raised a fair probability that a criminal enterprise was being conducted at the places to be searched. No error occurred in the denial of appellants' motions to suppress.

### H. Alleged Instructional Error

Ordonez complains that the court failed to give a lesser included offense instruction *sua sponte* on the continuing criminal enterprise charge. 21 U.S.C. § 848.

We need not reach this issue because we have determined that the judgment must be reversed as to each count. It would serve no useful purpose for us to analyze the applicability of an instruction on this issue since we do not know what evidence will be offered in the event of a retrial.

The judgment is REVERSED as to each count. The order denying disclosure of the identity of the informant is vacated.