**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David CARRAZANA, Pablo Carballo, Anselmo Cosio, Carlos Manuel Gonzalez, Jesus Garcia, Raul Z. Plasencia, Maria Elena Plasencia, Miguel Diaz, Defendants–Appellants.**

No. 88–5557.

United States Court of Appeals, Eleventh Circuit.

Jan. 30, 1991.

---

Carlos A. Rodriguez, Miami, Fla., for Carrazana.

Paul Morris, G. Richard Strafer, Stephen J. Bronis, Coral Gables, Fla., for Cosio, Gonzalez, Carballo and R.Z. and M.E. Plasencia.

Benjamin S. Waxman, Miami, Fla., for Garcia.

Bonnie Phillips Del Corral, Miami, Fla., for Diaz.

Dexter W. Lehtinen, U.S. Atty., Stephen Schlessinger, Linda Collins Hertz and Mayra R. Lichter, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before JOHNSON and HATCHETT, Circuit Judges, and DYER, Senior Circuit Judge.

HATCHETT, Circuit Judge.

In this multiple defendant cocaine trafficking case, we affirm the convictions.

## FACTS

On March 6, 1987, Eugenio Esteban was found murdered in his automobile in Miami, Florida. Esteban had worked at a gas station owned by Raul Plasencia. After starting work at the station in 1984, Esteban rapidly improved his standard of living, as evidenced by his acquisition of a $65,000 boat and a $50,000 Mercedes–Benz automobile. Initially, the Miami Metro–Dade Police Department's Homicide Division failed to develop any suspects.

On April 2, 1987, homicide investigator Andres Falcon received the first of five telephone calls from an unknown tipster. Based primarily upon these calls, which Detective Falcon and other investigators believed revealed an intimate knowledge of the Esteban homicide and of the criminal activities of Plasencia and his associates, the officers submitted a seventy-six page affidavit to a Florida district court of appeals chief judge and obtained authorization to wiretap land-line telephones located in Raul Plasencia's residence.

The tipster told Detective Falcon that he and Esteban had worked as warehousemen and occasional distributors for an extensive cocaine trafficking organization headed by Plasencia. According to the tipster, Esteban had been murdered because he had failed to compensate the organization for his loss of a hundred kilograms of cocaine with which he had been entrusted. Significantly, the tipster stated that Esteban's killer had carried a .32 caliber semi-automatic PPK handgun—a fact which the police had been careful to keep confidential. The tipster also stated that "Carlito," one of Esteban's executioners, lived at 13255 N.W. 1st Lane. Detective Falcon later learned that the address as given was inaccurate, but that an individual named Carlos Perez resided at 13253 N.W. 1st Lane. Presented with a number of photographs, an eyewitness to the Esteban murder selected the one of Carlos Perez as the one most closely resembling Esteban's murderer. The tipster also identified Pablo Carballo as a principal aide to Plasencia, a fact substantiated six weeks later when the captain of a vessel containing 2,300 pounds of cocaine was found in possession of Carballo's cellular telephone number. Additionally, the tipster stated that Plasencia felt secure within his own mansion and used its communications facilities to direct the organization's narcotics activities.

Based in part upon communications intercepted over those telephones, the detectives sought authorization to electronically tap mobile telephones used by Plasencia and his associates allegedly for conducting criminal conversations. On September 5,

1987, a Florida Supreme Court Justice authorized interception of wire and oral communications occurring over Plasencia's mobile telephones. The electronic surveillance and the investigative activities it engendered revealed the operations of a large cocaine trafficking organization.

As a result of the investigation, the law enforcement officers concluded that Plasencia was the leader of a criminal enterprise. Maria Elena Plasencia, Raul's wife, was a trusted member in the conspiracy. Carlos Veccio and Carballo, Maria's brother, acted as lieutenants in the organization. Perez, together with Maria's brother-in-law, David Carrazana, provided security for the organization, including counter-surveillance activity. Jesus Garcia and Orlando Nunez acted as warehousemen, storing Plasencia's cocaine in their residences, and delivering it as directed by Plasencia or his lieutenants. The surveillance also unmasked customers of the organization, including Miguel Diaz, Anselmo Cosio, and a man known only as John Doe.

On September 7, the officers intercepted a call from Diaz to Maria Elena Plasencia requesting ten "puppies," i.e., ten kilograms of cocaine. Raul Plasencia then called Nunez to Plasencia's house. From the house, Nunez called Diaz and confirmed the order. Nunez returned home and later delivered the cocaine to Diaz's house where the two met in the driveway. Plainclothes detectives interrupted the sale, announced their identities, seized the cocaine, and then left the scene leaving Nunez and Diaz with the belief that they had been "ripped off" by rival drug dealers or dishonest law enforcement officers.

The officers hoped that continuing electronic surveillance would, in the aftermath of the seizure, provide further information concerning the Plasencia drug network. Indeed, the officers soon intercepted a number of calls between the Plasencias, Nunez, and Veccio discussing the loss of the cocaine and the need for caution. The officers also monitored conversations arranging a ten kilogram cocaine sale from Plasencia and Veccio to Doe and his partner, Cosio.

On September 8, Veccio met Cosio at Veccio's restaurant. The two then drove separately to Veccio's house and waited in the driveway. Garcia, who had confirmed the sale with Plasencia by phone, then arrived. Cosio visually inspected a box in Garcia's car, carried it to his car, and drove away. Plainclothes officers stopped Cosio's car after several miles, seized the box which contained cocaine, but again made no arrests.

On September 14, officers visited Garcia's home and sought consent to search the residence. Garcia declined to permit the search. Upon their departure, the officers saw Garcia drive his car in a frenzied manner to a rear entrance of the house and throw some heavy bags into the trunk of the car. Garcia left in haste, but officers stopped him several blocks away and discovered eighty-six kilograms of cocaine in the trunk of the car.

## PROCEDURAL HISTORY

On October 2, 1987, a grand jury returned a five-count indictment against the appellants. The grand jury charged Raul and Maria Elena Plasencia in Count I with operating a continuing criminal enterprise, and charged the Plasencias, Veccio, Carballo, Carrazana, Diaz, Garcia, and Cosio in Count II with conspiracy to distribute cocaine, and in Counts III through V with possession of cocaine with the intent to distribute it, each possession count corresponding to each of the three seizures.

The appellants (except Cosio who is without standing) moved to suppress the fruits of the wiretaps. After conducting a lengthy evidentiary hearing, the district court denied the motion to suppress.

After seven days of trial, the Plasencias, Carballo, Carrazana, Diaz, and Garcia each entered a guilty plea to one count of possession of cocaine, preserving their right to appeal the district court's denial of their motions to suppress the wiretap evidence. A jury found Veccio guilty as charged and

Cosio guilty on the conspiracy count and on one substantive count.

## CONTENTIONS

The appellants contend the district court erred in denying the motion to suppress the wiretap evidence.

Cosio contends the evidence was insufficient to support his conspiracy and possession convictions and the district court erred in denying his motion for severance.

Veccio contends the district court erred in permitting the admission of "interpretive" expert testimony and erred by instructing the jury that six of the eight defendants pleaded guilty.

Raul Plasencia contends the government breached his plea agreement by asserting a position at sentencing inconsistent with the terms of the agreement.

## ISSUES

The issues are: (1) whether the district court erred in denying the appellants' motion to suppress the wiretap evidence; (2) whether the evidence was insufficient to support Cosio's convictions for conspiracy and possession; (3) whether the district court erred in denying Cosio's motion for severance; (4) whether the district court erred in permitting the admission of expert testimony; (5) whether the district court erred in instructing the jury that certain defendants had pleaded guilty during the trial; and (6) whether the government breached its plea agreement with Raul Plasencia.

## DISCUSSION

### I. Motion to Suppress

The appellants contend that the district court erred in denying their motion to sup-press the introduction of the intercepted cellular phone conversations by determining that: (1) Florida's highest court had lawful authority to approve the monitoring of a mobile telephone; (2) a substantial basis for the issuance of the initial wiretap order existed; (3) alternative investigative techniques were unlikely to succeed and consequently electronic surveillance was necessary; and (4) the initial authorization of a thirty-day wiretap was sufficiently justified.

### A. *Federal Court Order Requirement*

■ Whether a federal court order is a prerequisite to the lawful interception of communications conducted on cellular telephones is subject to plenary review. *See United States v. Alexander*, 835 F.2d 1406 (11th Cir.1988) (application of law to facts upon review of denial of suppression motion subject to de novo review).

■ In 1968, Congress preempted the field of interception of wire and oral communications by enacting Title III of the Omnibus Crime Control and Safe Streets Act, Pub.L. 90–351, 82 Stat. 212 (1968) (codified at 18 U.S.C. § 2510 *et seq.*). In 1986, Congress enacted the "Electronic Communications Privacy Act of 1986," Pub.L. 99–508, 100 Stat. 1848 (1986) ("ECPA"). The ECPA amended Title III to protect cellular communications from interception without prior judicial approval.

A special rule accompanied the ECPA to afford those states with wiretap statutes an opportunity to conform to the amendments. Pub.L. 99–508, § 111(b). The rule states that if a state-authorized interception would be valid without regard to the amendments, it would be deemed valid notwithstanding the amendments, if applied within two years of October 21, 1986, and if conducted pursuant to 18 U.S.C. § 2516(2).[1]

---

1. Public Law 99–508, § 111(b) provides in full: Any interception pursuant to section 2516(2) of title 18 of the United States Code which would be valid and lawful without regard to the amendments made by this title [enacting sections 2521 and 3117 of this title, amending this section and sections 2232, 2511 to 2513, 2516(1)(a), (1)(c), (1)(g) to (*l*), (2), (3), and 2517 to 2520 of this title, and enacting provi-

sions set out as notes under this section] shall be valid and lawful notwithstanding such amendments if such interception occurs during the period beginning on the date such amendments take effect and ending on the earlier of—

(1) the day before the date of the taking effect of State law conforming the applicable

Title 18 U.S.C. § 2516(2) provides in relevant part:

> The principal prosecuting attorney of any state ... if such attorney is authorized by a statute of that state to make application to a state court judge ... for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for ... an order authorizing, or approving the interception of wire or oral communications.

(West Supp.1990).

In 1987, Florida law did not explicitly provide for judicial authorization of the interception of cellular communications.[2] The appellants contend that the special rule providing for a two-year grace period for states whose statutes authorize such an interception, does not apply to the situation in Florida where the state law neither required nor authorized an interception order for cellular communications. The appellants conclude that the wiretap evidence is inadmissible because the law enforcement officers failed to first obtain a federal court order authorizing the interception of cellular telephone conversations as required by law.

The appellants erroneously presume that authorization for a mobile telephone wiretap could not have been sought from the state court because such interceptions could arguably have been accomplished prior to the enactment of the ECPA without any court order. The fact that mobile telephone interceptions might lawfully have been accomplished under Florida law without court order did not preclude the Metro–Dade officers from seeking judicial authorization for such surveillance. Indeed, in *Dorsey v. State*, the court explicitly declined to decide whether the interception of "land-line telephone messages transmitted in part by wireless signals" would require a wiretap order. 402 So.2d 1178, 1184 n. 4. By obtaining a state court order for the Plasencias' cellular telephone numbers, the police officers were attempting to ensure against any possible violation of Florida's wiretapping laws in the event a combination of cellular and wire transmissions was utilized during the course of an intercepted conversation. Thus, the cellular telephone wiretap was not outside the scope of 18 U.S.C. § 2516(2) and was authorized by federal law under the special rule found in Public Law 99–508, § 111(b).

■ Moreover, even if the officers technically violated federal statutes by not applying for a federal court order, no prejudice resulted. The purpose of the federal legislation was to ensure that surveillance of cellular communications did not occur without following federally mandated procedures or certain prior state court procedures. In this case, the officers followed a state court procedure with virtually identical standards as those found in the federal procedure and any resulting error was harmless.

### B. *Probable Cause*

Section 934.09(3)(a), Florida Statutes, requires that issuance of an order authorizing the interception of wire or oral communications be predicated on a judicial finding of "probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in s. 934.07." (West Supp.1990). *Cf.* 18 U.S.C. § 2518(3)(a). The probable cause finding is based upon the "totality of the circumstances," and we review that decision to ensure that the authorization was issued upon a substantial basis for concluding that probable cause existed.

---

State statute with chapter 119 of title 18, United States Code, as so amended; or

 (2) the date two years after the date of the enactment of this Act [Oct. 21, 1986].
18 U.S.C. § 2510 historical note (West Supp. 1990).

2. In examining the scope of chapter 934, Florida Statutes, the Florida Supreme Court construed "the prohibition of interception of wire communications 'made in whole or in part through the use of facilities for the transmission or communications by the aid of wire ...' to apply only to so much of the communication as is actually transmitted by wire and not broadcast in a manner available to the public." *Dorsey v. State*, 402 So.2d 1178, 1183 (Fla.1981) (police interception of messages broadcast over radio waves to a pocket pager does not require a court order).

*United States v. Nixon,* 918 F.2d 895, 900 (11th Cir.1990) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

 The determination of an informant's credibility is based upon the "totality of the circumstances," including the traditional review of the basis of his knowledge and reliability. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332. The *Gates* standard requires only that "major portions" of the informant's statements be verified. 462 U.S. at 246, 103 S.Ct. at 2336. In this case, the tipster gained his information from direct, personal involvement in Plasencia's organization. Over an extended period of time, the tipster provided a vast quantity of detailed information, the principal portions of which were corroborated. The appellants do not confront the volume of uncontested data establishing probable cause to believe that Raul Plasencia was operating a narcotics distribution network. Rather, the appellants contend that the district judge erred in concluding that the issuing court had been presented a fair opportunity to assess the reliability of the tipster, in light of the claim that misrepresentations in the affidavit bolstering the tipster's credibility were intentionally included and impeaching information deliberately omitted.[3] In support of their argument, the appellants list numerous instances in which allegations made in the affidavit are contrasted with the testimony adduced at the evidentiary hearing on the motion to suppress.

An examination of the record, however, belies the appellants' argument. All of the appellants' assertions of error were the subject of factual disputes which were exhaustively reviewed by the district court. The district court carefully considered many witnesses' testimony and assessed their credibility. In its order, the district court rejected all but six claims, finding that those remaining were immaterial and insufficient to counter the incriminating information presented in the affidavit.[4] Moreover, the affidavit reveals instances where the affiants were careful to inform the issuing judge that the tipster had provided information that had not or could not be corroborated.[5]

The district court's underlying factual findings are reviewable under the clearly erroneous standard. *United States v. Wuagneux,* 683 F.2d 1343, 1355 (11th Cir. 1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). The claims of error which were proven were properly deemed immaterial, and the district court properly found that the court issuing the initial wiretap had a substantial basis for its probable cause finding.

## C. *Alternative Investigative Means*

 An application for an order authorizing the interception of wire communica-

---

3. Wiretap applications must contain a "full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued...." Fla.Stat.Ann. § 934.09(1)(b) (West Supp.1990); 18 U.S.C. § 2518(1)(b).

4. The district court found that

the inaccuracies in the affidavit which the Defendants have established are references to Agent Grassman's having told Detective Parr that two confidential informants identified Plasencia and Carballo as involved in drug smuggling, when Agent Grossman [sic] now recalls having mentioned only one; the dates of the Rios and Carballo interviews, which occurred on March 16 rather than May 16; the date of Detective Parr's unsuccessful surveillance of the Plasencia residence which occurred on April 21, but which is variously reported to have taken place on May 21 and June 21; and the date on which the tipster called while Detective Falcon was out of

town, which was reported as April 23, when in fact it was April 28. Additionally, Detective Falcon, in testimony at the suppression hearing, revised his statement of prior experience in wiretap cases to reflect his having acted once as a monitor and another time as a surveillance agent, rather than having acted twice as a monitor, as the affidavit states. Finally, while the evidence is not conclusive, the Court would find that on the evening of April 21, Detective Falcon saw a dark car in the Plasencia compound which only appeared to be a Mercedes, but which he could not positively identify as such.

5. For example, the affiants openly reported that the tipster gave them an inaccurate address for the residence of Carlos Perez. They also stated that the tipster insisted that Plasencia's operations were protected by various corrupt police officers, though no official wrongdoing was ever detected. The affidavit also revealed other allegations of the tipster which were not confirmed after subsequent police investigation.

tions must include "[a] full and complete statement as to whether or not other investigative procedures had been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Fla.Stat.Ann. § 934.09(1)(c) (West. Supp.1990); 18 U.S.C. § 2518(1)(c). The appellants contend that the district court erred in concluding that the affidavit and its supporting evidence demonstrated that less intrusive investigative methods were unlikely to succeed.

An expert witness for the appellants testified that stationary surveillance could easily have been accomplished of the Plasencia residence. Yet, the expert was unaware of the countersurveillance measures which Plasencia had in place, and he conceded that countersurveillance would affect the type of observations which could successfully be undertaken. In fact, high walls encircling the Plasencia residence and security cameras sweeping the surrounding area hindered stationary observation of the compound. The affidavit recites that on some forty-nine occasions attempts to determine what cars had entered the Plasencia compound were unsuccessful.

The appellants also contend that the affidavit failed to specify how stationary surveillance of a score of other residential and business premises suspected of involvement with the organization under investigation had been tried and failed or why it was unlikely to succeed if tried. The affidavit, however, does state that several attempts were made to follow Carballo and on each occasion he engaged in evasive maneuvers which frustrated the attempts to follow him. Likewise, efforts to conduct physical surveillance of Carballo's residence and of suspected cocaine storage sites were unsuccessful.

The appellants assert that during the four and one-half month investigation, the officers should have cultivated the apparently well-connected tipster into a confidential informant for use in an undercover investigation. The officers, however, should not be faulted for failing to unmask the tipster. His calls were unannounced and generally of short duration. The tip-ster sought to conceal his identity and acted accordingly. Even if the tipster had been identified, one cannot presume that he would have agreed to act as an informant given his fear of the Plasencia organization.

The appellants also contend the law enforcement officers failed to attempt any infiltration of the organization though undercover agents, failed to execute search warrants at any of the premises suspected of containing cocaine, failed to subpoena any of the persons suspected of being involved in the organization to testify before the grand jury, and failed to offer immunity or protective services of the government to any of these potential witnesses. These arguments were fully presented to the district court which properly concluded that none of the alternative techniques suggested would have been feasible.

It is true that " 'we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.' " *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.1985) (quoting *United States v. Robinson*, 698 F.2d 448, 453 (D.C.Cir. 1983) (per curiam) (emphasis in original)). The necessity for electronic eavesdropping in this case was considered in light of the demonstrated futility of alternative means of investigation. The district court did not err in concluding that electronic interception was a necessary tactic in this criminal investigation. *See United States v. Van Horn*, 789 F.2d 1492, 1496–97 (11th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 124 (1986).

### D. *Thirty–Day Duration of Wiretap Authorization*

■ If a wiretap order authorizes electronic surveillance to continue after the first interception of a communication of the type sought, the application must contain "a particular description of facts establishing probable cause to believe that additional communications of the same type will

occur thereafter." Fla.Stat.Ann. § 934.09(1)(d) (West Supp.1990); 18 U.S.C. § 2518(1)(d).

The initial wiretaps on the Plasencias' phones were authorized to continue beyond interception of the first incriminating conversations up to a period of thirty days. The appellants contend that this portion of the order was based on the affiants' conclusory allegation that "the nature of this investigation is such that the court's authorization for interception should not automatically terminate when the type of communications described [above] have first been obtained." According to the appellants, the affiants failed to make the necessary showing of a particular description of facts establishing probable cause.

Contrary to the appellants' assertions, given the complexity of the case as fully set forth in the affidavit, we find abundant probable cause existed to justify the thirty-day duration of the initial wiretap authorization. The affidavit alleged the existence of a complex, continuing narcotics conspiracy involving many persons, each performing specialized tasks within the criminal organization. The expressed objectives of the investigation were to assemble evidence of this wrongdoing. Probable cause existed to lead one to believe that more than a single relevant conversation would take place or even a limited and discrete series of relevant conversations. *See, e.g., United States v. Sklaroff,* 323 F.Supp. 296, 306–07 (S.D.Fla.1971), *aff'd,* 506 F.2d 837 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975).

## II. Sufficiency of the Evidence

To determine whether sufficient evidence supports Cosio's convictions for conspiracy and possession, we review the evidence in the light most favorable to the government and consider whether a reasonable jury could find it proves Cosio's guilt beyond a reasonable doubt. *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984).

■ In order to sustain Cosio's conviction for conspiracy, we must determine if the evidence established that a conspiracy existed, and that, with an understanding of its essential objective, Cosio voluntarily became a part of it. *United States v. Lee,* 695 F.2d 515, 517 (11th Cir.), *cert. denied,* 464 U.S. 839, 104 S.Ct. 130, 78 L.Ed.2d 125 (1983). The requisite proof may be established by circumstantial evidence, or by inferences to be drawn from the conduct of an individual or his confederates. *United States v. Bascaro,* 742 F.2d 1335, 1359 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985).

■ According to Cosio, other than his one isolated act of retrieving cocaine from Garcia's car in Veccio's driveway, no evidence shows Cosio to have had any connection with any of the other co-defendants. Cosio contends that this evidence alone is insufficient to link him to the conspiracy.

Cosio's argument omits proof at trial which revealed an agreement by Veccio to distribute ten kilograms of cocaine to Doe and Cosio. Intercepted phone conversations revealed that Doe could not take delivery of the cocaine at the time arranged, so he informed Veccio that his associate, Cosio, could pick up the cocaine. Doe assured Veccio that Veccio knew Cosio, and after conceding that he was acquainted with Cosio, Veccio agreed to deliver the cocaine to Cosio. During the course of phone calls, Doe referred to Cosio as his "partner."

Based upon the foregoing, we conclude that the jury was entitled to find that Cosio had entered the conspiracy. His activity consisted of planning the pickup of a large quantity of cocaine, personal execution of the delivery, and a readiness to discuss its consequences. Even if Cosio's participation is viewed as a single act of retrieving ten kilograms of cocaine, the jury could presume that Cosio was familiar with the prior illicit activities of both Doe and Veccio, and infer his knowledge of the broader, ongoing conspiracy. Cosio's conduct was sufficient to implicate him in the conspiracy. *See United States v. Hawkins,* 661 F.2d 436, 454 (5th Cir.1981), *cert. denied,*

456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).[6]

## III. Severance Motion

 Severance is warranted where the joinder of defendants in a trial together results in compelling prejudice. *United States v. Marszalkowski,* 669 F.2d 655, 660 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). If the jury cannot keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to each, severance should be granted. *Marszalkowski,* 669 F.2d at 660. Cosio contends that the district court erred in denying his motion for severance because the admission of the wiretap evidence against Veccio deprived Cosio of his right to a fair trial. Through severance relief, Cosio claims that he would have received a trial free from the prejudicial effects associated with the wiretap evidence against Veccio.

 Cosio's argument is conclusory and fails to explain how severance would have prevented his jury from being exposed to the "prejudicial" evidence. The wiretap evidence against Veccio would have been admissible under Federal Rule of Evidence 801(d)(2)(E) in its entirety against Cosio even at a separate trial because Veccio's conversations constitute statements of a co-conspirator made in furtherance of the conspiracy.[7] Cosio has identified no evidence not admissible against him at a separate trial, much less evidence of such a specific and compelling prejudice as to mandate a severance. Accordingly, the district court did not abuse its discretion in denying Cosio's motion for severance.

## IV. Expert Testimony

 The district court has broad discretion in admitting or excluding expert testimony. The court's decision is to be sus-

tained on appeal unless it is manifestly erroneous. *United States v. Brown,* 872 F.2d 385, 392 (11th Cir.), *cert. denied,* ——— U.S. ———, 110 S.Ct. 253, 107 L.Ed.2d 203 (1989). Veccio contends that the district court improperly permitted Sergeant Carlos Gonzalez of the Metro–Dade Police Department to testify to his understanding of certain code words or phrases overheard in the intercepted conversations and to further testify as to the identities of individuals referred to by nickname in certain calls.

Federal Rule of Evidence 702 states that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." (West 1984). Veccio contends that Sergeant Gonzalez had no specialized training in the use of codes and had never before been qualified as an expert. At the time of trial, Sergeant Gonzalez had been a police officer for twelve years in the Metro–Dade Police Department, had investigated numerous narcotics cases, and is a native Spanish speaker with an understanding of slang peculiar to the Cuban dialect. From the monitoring's inception, he supervised and coordinated the efforts of the agents intercepting the calls with the police surveillance teams. He worked twelve-hour shifts in the monitoring outposts and overheard the conversations as they were intercepted. He also listened to significant calls that occurred while he was off duty.

 Law enforcement officers may testify as to the meaning of slang or code words. *United States v. Brown,* 872 F.2d at 392 (agent properly permitted to testify that defendant's use of terms "paper," "candy," and "dresses" were references to cocaine). Veccio contends that while a qualified expert may testify in a limited

---

**6.** Because we do not believe Cosio's conspiracy conviction should be set aside for insufficient evidence, we do not address his argument that his conviction for possession must be remanded for a new trial because his trial upon the possession charge was tainted by evidence relating to his involvement in the conspiracy.

**7.** Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." (West Supp.1990).

fashion about codes, it is impermissible to allow interpretive testimony of the sort at issue in this case. *United States v. White*, 569 F.2d 263, 267 n. 4 (5th Cir.), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978). *See also United States v. Dicker*, 853 F.2d 1103, 1108 (3d Cir.1988). Veccio contends that the clearest example of the improper admittance of Gonzalez's testimony occurred in permitting his interpretation of the word "family" in several calls. Despite the fact that the district court initially struck from the record Sergeant Gonzalez's translation of this word as meaning "cocaine," the prosecutors continued to point out when the word "family" appeared in conversations until they prevailed in eliciting the testimony previously found to be improper.

■ After carefully reviewing the record, we conclude that even if it was improper to admit Sergeant Gonzalez's testimony concerning certain code words or phrases, and other instances wherein Sergeant Gonzalez set forth the identity of an individual referred to by nickname, Veccio is not entitled to prevail on appeal because the error was harmless beyond a reasonable doubt. *See United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989). Aside from Sergeant Gonzalez's testimony, overwhelming independent evidence was presented concerning Veccio's involvement in the drug conspiracy sufficient to negate any reasonable doubt as to whether the error contributed to his conviction.

## V. The Jury Instruction

After seven days of trial, six defendants entered pleas of guilty outside the presence of the jury. Veccio and Cosio continued with their joint trial. They made no motion for a mistrial. At their request, the court advised the jury according to an instruction prepared by the defense as to the reason for the sudden absence of the other defendants in the case. On appeal, Veccio contends that although he requested the

charge, it constituted plain error and requires that his conviction be reversed.

■ To the contrary, the fact that a co-conspirator's guilty plea was made known to the jury will rarely result in plain error even when no cautionary instruction is given. *United States v. King*, 505 F.2d 602, 608 (5th Cir.1974).[8] In the absence of aggravated circumstances, a cautionary instruction directing the jury not to consider a guilty plea as substantive evidence of guilt will sufficiently cure any potential for prejudice to the defendant on trial. *United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir.1969). The instruction given in this case plainly directed the jury not to consider the co-defendants' guilty pleas as substantive evidence against appellants. The comprehensive instructions given were sufficient to remove any prejudice which might otherwise have flowed from the jury's knowledge that six co-defendants had pleaded guilty.

■ Moreover, because Veccio caused the evidence of the co-defendant's guilty plea to be presented as a tactical trial decision, he waives any claim of error on appeal. *United States v. Cook*, 461 F.2d 906, 910–11 (5th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 219 (1972). Veccio made a deliberate tactical decision in requesting that the jury be informed that the co-defendants had entered pleas of guilty. Indeed, over the government's objections, Veccio requested that the jury be told specifically to which count each defendant had pleaded guilty.

## VI. Prosecutorial Misconduct

■ "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). Moreover, the court must use objective standards to determine the disputed terms of the plea agreement. *In re Arnett*, 804 F.2d 1200,

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981), the court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

1202 (11th Cir.1986). Raul Plasencia pleaded guilty to Count III of the five-count indictment which charged Plasencia with possession with intent to distribute cocaine. In exchange for Plasencia's guilty plea, the government promised to dismiss with prejudice the remaining counts of the indictment at the time of sentencing. The government also promised to make no recommendation as to the quality or quantum of punishment.

Plasencia contends that the government breached its agreement when in response to defense counsel's recommendation that the court impose a twenty-year sentence, the prosecutor commented:

> I think, Your Honor, for Mr. Cagney to suggest the court put twenty years as an appropriate sentence under these circumstances they are, Your Honor, with respect to the relevant culpability of the other defendants; let me say we can't believe the level of this comparison to any defendant, whether they went to trial or pled out.
>
> Your Honor, Mr. Plasencia was the kingpin in this organization. It was clearly his organization....

Plasencia contends that the prosecutor's statement amounts to disparaging criticism of the recommended twenty-year sentence, and reads like an abbreviated but emphatic closing statement urging the court to find the defendant guilty of managing a continuing criminal enterprise in violation of 21 U.S.C. § 848.

The government, however, expressly reserved in the plea agreement the right to inform the court and the probation department of all facts relevant to the sentencing process. The dismissal of the continuing criminal enterprise count as part of the plea bargain did not preclude the government from characterizing Plasencia as the ringleader or principal in the offense. "It is acceptable to consider evidence of crimes for which defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well." *Tucker v. Kemp,* 762 F.2d 1480, 1487 (11th Cir.) (en banc), *vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985),

*reinstated,* 802 F.2d 1293 (1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987). The prosecutor's statement concerning Plasencia's leading role in the offense was relevant to the sentencing process. The government never agreed that Plasencia was not the "kingpin" or that it would refrain from characterizing him as such. Consequently, the prosecutor's statement was not a breach of Plasencia's plea agreement.

## CONCLUSION

For the reasons stated above, we affirm the appellants' convictions and sentences.

AFFIRMED.