Kaplan, Mitchell H., J.
On November 29, 2008, the Superior Court (Ball, J.) issued an order authorizing the interception, monitoring and recording of commu *144 nications among defendant Ricardo Greene and his associates, agents, and co-conspirators relating to the possession or distribution of cocaine occurring over a certain cellular telephone (the wiretap and the wiretap warrant). Based upon evidence obtained directly or indirectly as a result of the wiretap warrant (and certain extensions of that warrant and follow-on warrants), Christian Miranda, Greene and other defendants were indicted for various offenses generally relating to the possession of cocaine with the intent to distribute it. The defendants identified in footnote 1 have filed or joined in Motions to Suppress Evidence Obtained from Electronic Surveillance. The defendants maintain that the Superior Court was not authorized by G.L.c. 272, §99 to issue the wiretap warrant and it is therefore unconstitutional or, alternatively, that it was issued in violation of G.L.c. 272, §99.
The parties have filed numerous briefs in support of and opposition to these motions and arguments of counsel were presented to the court at a hearing convened on December 8, 2010. After consideration of the foregoing, the Motions to Suppress Evidence Obtained from Electronic Surveillance are DENIED.
BACKGROUND
The affidavit submitted in support of the original wiretap warrant is 129 pages in length. It was authored by Detective Frederick M. Waggett of the Boston Police Department and Sergeant John M. Brooks of the Massachusetts State Police and executed by them on November 24, 2008 (the affidavit).[2],[3] The affidavit is incorporated by reference in this memorandum of decision. What follows is a summary of certain of the relevant averments set forth in it. Over the past fifteen years, the Boston Police Department Youth Violence Strike Force and Special Investigations Unit have been monitoring the activities of a group of individuals believed to be involved in violent street crime and narcotics distribution. This group identifies itself as the “Magnolia Street Steelers.” Many individuals claiming membership in the Magnolia Street Steelers openly identified themselves as members and were known to Boston Police Detectives Gregoiy Brown and Brian Smigielski. Those individuals include Greene and Miranda, as well as Errin Crawford, Elias Perea, and Keon Santos.[4] Detective Smigielski knows the Magnolia Street Steelers to be a violent group involved in narcotics distribution.
Confidential Informant
Defendant Greene came to the attention of investigating officers as an individual involved in the sale of large quantities of crack cocaine through a confidential informant (hereafter referred to as CI-01). The affidavit describes the officers’ relationship with CI-01 and their basis for concluding that he is a reliable source of information.[5]
CI-01 “knew of Greene as a result of a personal and illicit relationship that they shared for a period of several years.”[6] CI-01 claimed to “have made purchases of drugs, particularly crack cocaine, from Greene during this time.”[7] CI-01 told Detective Brown that CI-01 “had been in the presence of Greene when he sold cocaine to others.”[8] CI-01 also told police “that Greene identifies himself as a member of the Magnolia Street Steelers.”[9] According to CI-01, Greene was “known to associate with Errin Crawford, Jason DeP-ina, Teddy Duncan, Elias Perea, and Keon Santos.” Those individuals were known to the police as members of the Magnolia Street Steelers.
CI-01 told police that Greene sold large quantities of cocaine, up to 125 grams in a single transaction. CI-01 stated that Greene had been utilizing the services of his father, Ricardo Yore, and Jason DePina to distribute crack cocaine for him. CI-01 gave the police two telephone numbers associated with Greene. The first of these Greene stopped using before the police applied for the wiretap warrant which is the subject of this motion (original Greene telephone). The second number was for the cellular phone that is the subject of the wiretap (target telephone).[10]
Controlled Purchases
In August 2008, CI-01 called the original Greene telephone. Dt. Brown, in whose presence the call was made, was able to hear and recognize Greene’s voice on the other end of the call. CI-01 requested a specific amount of crack cocaine and arranged with Greene a time and place to meet to purchase it. At the agreed-upon location, police surveillance observed CI-01 approach a car driven by Yore and exchange currency for crack cocaine. Thereafter, CI-01 turned over rocks of crack cocaine to police.
In September 2008, CI-01 again contacted Greene on the original Greene telephone to arrange another purchase of crack cocaine. After following a substantially similar procedure to arrange the purchase, police surveillance observed CI-01 meet with Greene at the agreed-upon location and obtain crack cocaine from him. CI-01 turned over the narcotics to the police afterwards. In the same month, CI-01 participated in two additional controlled purchases of crack cocaine from Greene. To arrange the second of these latter two purchases, CI-01 called not the original Greene telephone, but the target telephone, which Greene told CI-01 to use to contact him to buy crack cocaine. On both occasions, CI-01 met Greene and obtained drugs from him.
On September 22, 2008, Boston Police Detective Gregoiy Walsh made a “cold call” to the original Greene telephone. He asked an individual identified as “Sport” to sell him an “eight-ball,” i.e., 3.5 ounces of cocaine. A meeting place and time was arranged. When Dt. Walsh arrived, he came upon a vehicle occupied by Greene, Jonathan Carter, and Elias Perea. Carter and Perea were known members of the Magnolia Street Steelers; CI-01 had told police that Perea was involved in cocaine distribution activities. Dt. Walsh observed *145 a plastic twist containing what appeared to be crack cocaine on the console of the vehicle. Dt. Walsh was told to get into the vehicle, but he refused and the occupants drove off without a transaction having taken place. Uniformed police officers stopped the vehicle soon afterwards; however, no cocaine was recovered.
In October 2008, CI-01 again called the target telephone to arrange a purchase of crack cocaine. Again, police surveillance observed CI-01 obtaining drugs from Greene at the location specified during the phone call, and obtained crack cocaine from CI-01 after the exchange was complete. On November 20, 2008, CI-01 contacted Greene on the target telephone again, and discussed the possibility of purchasing additional crack cocaine.
Telephone TolF Analysis
Toll analysis of Greene’s telephones suggested a connection between him and the Magnolia Street Steelers.[11] An administrative subpoena to Sprint/Nextel for records of calls made or received on the original Greene telephone revealed a substantial number of calls with individuals believed to be members of the Magnolia Street Steelers, for example: between May 19, 2008, and August 3, 2008, 182 calls were made to Erxin Crawford, 625 calls to Jason DePina, 619 calls to Elias Perea, 281 calls to Keón Santos, and 270 calls to Ricardo Yore. A subsequent subpoena for the records of the target telephone revealed that, between September 23,2008 and October 17, 2008, 23 calls were made to Crawford, 108 calls were made to DePina, and 107 calls were made to Yore.
Physical Surveillance
In addition, physical surveillance of Greene and his associates revealed behavior believed by the officers to be consistent with narcotics distribution activity. On September 3, 2008, Yore was seen leaving 186 Bowdoin Street in Boston, Greene’s residence.[12] Yore then drove in erratic patterns suggesting he was taking countersurveillance measures. He drove slower than the posted speed limit, frequently pulled over to the side of the road, made at least one U-turn, and circled some blocks. Yore eventually arrived at a location known to be frequented by members of the Magnolia Street Steelers.
On September 9, 2008, Yore exited the Greene residence and drove to a location where he met with two men who approached his vehicle.[13] Yore exchanged something with the two men, who then ran off.
On September 18, 2008, Greene, Keon Santos, and one other man exited the Greene residence and proceeded to drive in a “roundabout manner,” again suggesting efforts to detect police surveillance. The vehicle carrying Greene, Santos, and the other man eventually managed to evade police surveillance.
On October 7,2008, Greene and his associates were again observed engaging in erratic driving characteristic of countersurveillance efforts.
Trash Analysis
On August 26, 2008, the police examined trash found in front of Greene’s residence. It contained surgical gloves, plastic baggies cut at a forty-five degree angle, knots of plastic baggies, and vegetable matter including stems and seeds thought to be marijuana.[14]
On September 9, 2008, two unknown men were seen exiting the Greene residence carrying trash bags.[15] They deposited the trash bags in a dumpster some distance away from the Greene residence. Inside those bags, the police discovered digital scales, rubber gloves, plastic baggies cut at a forty-five degree angle, bank receipts, Western Union money order forms, photographs of Greene, and a sheet of paper with numbers written on it, thought to document sales of narcotics.[16]
On September 6, 2008, the police inspected the trash outside the Yore residence, at 130 Greenfield Road in Mattapan, Massachusetts. They found rubber surgical gloves, plastic baggies cut at forty-five degree angles, and knots of plastic bags.
The items listed above are generally recognized as paraphernalia associated with drug distribution.
Necessity
The affiants averred that using conventional investigative techniques was “extremely difficult due to the code of silence and element of secrecy under which the [defendants] are able to operate due to the fear they have instilled on [sic] their respective neighborhoods and victims.”[17] The police were unable to find anyone, including CI-01, willing to testify against the defendants in court. Furthermore, the police could not recruit any other informants willing to offer information regarding the defendants.
The affiants believed that attempts to infiltrate an undercover officer within the defendants’ organization would prove ineffective, due to the insular nature of their group, and would be dangerous, given the prior violent conduct of the group’s members.
The defendants’ use of countersurveillance measures limited the effectiveness of physical surveillance. In addition, physical surveillance and telephone toll analysis could only offer limited information on other individuals who might be associated with the defendants’ drug dealing organization, particularly those in the upper echelons, such as Greene’s cocaine supplier.
Execution of search warrants or grand jury subpoenas would likely alert remaining gang members to the police’s investigation and prompt them to flee or destroy evidence.
*146 DISCUSSION
The defendants challenge the legality of the wiretap warrant on three grounds. The defendants first argue that the Superior Court is without authority to issue wiretap warrants under G.L.c. 272, §99, because that statute does not cover oral communications by cell phone and, in the absence of an authorizing statute, the courts of the Commonwealth cannot constitutionally issue warrants to intercept cell phone communications. In the event that the court determines that it has the authority to issue wiretap warrants, the defendants make two arguments based on the alleged insufficiency of the affidavit to support two findings that are statutory prerequisites to the issuance of a wiretap. The defendants maintain that the affidavit: (a) fails to establish that any designated offense was occurring in connection with organized crime; and (b) does not demonstrate that normal investigative procedures were or would have been unsuccessful.
A. The Superior Court’s Authority to Issue Warrants for Communications Between Cell Phones
The defendants argue that the Superior Court is without authority to issue wiretap warrants for the interception and recording of cell phone communications because the language of G.L.c. 272, §99 is substantially identical to cognate federal wiretap legislation, since amended, 18 U.S.C. §2510 (1968), which has been held not to apply to cell phones. They cite United States v. Carrazana, 921 F.2d 1557, 1563 (11th Cir. 1991), and Edwards v. State Farm Ins. Co., 833 F.2d 535, 540 n.8 (5th Cir. 1987), in support of this argument. While the language of 18 U.S.C. §2510 was later amended to include cell phone communications technology, see Pub L. 99-508, §111(b) (1986), the language of the Massachusetts analog, G.L.c. 272, §99, was not. Therefore, the defendants contend, G.L.c. 272, §99 does not authorize wiretap warrants for cell phones.
The defendants’ position has been considered, at some length, in several decisions of the Superior Court and by the United States District Court for the District of Massachusetts and has been rejected each time. See, e.g., Commonwealth v. Cariello, Criminal Action No. 08-918 (Middlesex Super.Ct., August 17, 2009) (Roach, J.); Commonwealth v. Alleyne, Criminal Action No. 06-1982, 2007 WL 4997621 *2 (Essex Super.Ct. Nov. 1, 2007) (Kern, J.); Commonwealth v. Simone, Criminal Action No. 01-4901, (Middlesex Super.Ct. Jun. 8, 2004) (Hamlin, J.); Commonwealth v. Aldana, Criminal Action No. 02-0216, (Middlesex Super.Ct. Sept. 25, 2003) (Hamlin, J.); Commonwealth v. Sanders, Criminal Action No. 00-1533, (Middlesex Super.Ct. Aug. 18, 2003) (Donovan, J.); and United States v. Gianelli, 585 F. Sup.2d 150, 163 (D.Mass. 2008) (“Massachusetts courts have previously interpreted the state wiretap statute to have incorporated an amendment to the federal wiretap statute. The Massachusetts Superior Courts have repeatedly held that the Massachusetts wiretap statute empowers state courts in Massachusetts to authorize the interception of cellular phone conversations”) (internal citation omitted).
The court agrees with each of the other trial courts that have confronted this issue, and holds that G.L.c. 272, §99 authorizes the Superior Court to issue wiretap warrants for communications between cell phones, if the statutoiy requirements for such warrants have been satisfied. While no Massachusetts appellate court has directly addressed this issue in the several years since trial courts were first called upon to consider it, the Supreme Judicial Court has expressly noted that §99 “broadly prohibits the interception of speech” and approved of the Appeals Court’s use of statutory construction that furthers the legislative intent that the privacy of oral communications be protected. See Commonwealth v. Hyde, 434 Mass. 594, 600 n.6 and 602 n.8. Applying the protective measures of §99 to the right of law enforcement to intercept cell phone communications is certainly consistent with legislative intent and meets the United States Constitutional requirements (both Fourth Amendment and pre-emptive) for interception of such communications. See United States v. Carrazana, 921 F.2d at 1563.
B. The Sufficiency of the Affidavit 1. The Standards for Review
“A [wiretap] warrant may issue only . . . [u]pon a showing by the applicant that there is probable cause to believe that a designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained and [u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried.” G.L.c. 272, §99(E)(2)-(3). In connection with the foregoing, “(t]he term ‘designated offense’ shall include the following offenses in connection with organized crime . . . any offense involving the possession or sale of a narcotic or harmful drug . . . and conspiracy or attempt or solicitation to commit any of the foregoing offenses.” G.L.c. 272, §99(B)(7). “Organized crime” means “a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services.” G.L.c. 272, §99(A). In consequence, “the use of [electronic interception] devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime . . . , [and] the statute requires a showing that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed. Commonwealth v. Long, 454 Mass. 542, 553 (2009) (internal citations and quotations omitted). Except in limited circumstances, not relevant to this case, a determination of whether ’’probable cause" to believe that the statutory *147 requirements have been established is limited to a review of the four comers of the affidavits filed in support of the application for the warrant. Id. at 554. Finally, “[i]t is not [the] province [of the reviewing court] to engage in de novo review of an application for a wiretap warrant; instead [the reviewing court] test[s] it in a practical and common sense manner to determine whether the facts the application sets forth are minimally adequate to support the findings made by the issuing judge.” Commonwealth v. D’Amour, 428 Mass. 725, 736
2. Nexus to Organized Crime
The defendants concede that the affidavit established probable cause to believe that designated offenses—namely, possession and sale of narcotic drugs—had been committed. However, they maintain that the affidavit did not show that those designated offenses were being committed in connection with organized crime, as required by G.L.c. 272, §99(A).
“In determining whether the requisite connection to organized crime exists, [courts] consider whether the materials supporting an application for a wiretap warrant demonstrate an objectively reasonable suspicion grounded in ‘articulable facts from which a person could conclude that interception would lead to evidence of a designated offense’ in connection with organized crime.” Commonwealth v. Long, 454 Mass. at 556, quoting Commonwealth v. Thorpe, 384 Mass. 271, 281 (1981).
The defendants argue that the affidavit describes only “garden-varieiy” drug-dealing, which was not exceptionally extensive or sophisticated, and therefore cannot be found to have been undertaken “in connection with organized crime.” However, the definition of organized crime set forth in §99(A) does not require the court to distinguish between “garden-variety” drug dealing and drug dealing by individuals operating at the highest level of the organizational pyramid associated with the illicit sale of drugs. To the contrary, decisions interpreting §99(A)’s requirement of a nexus to organized crime differentiate between garden-variety criminal activity, and organized crime, that is crime engaged in by multiple “players,” such as drug dealing generally. See Commonwealth v. D'Amour, 428 Mass. 725, 737 (1999).
No case stands for the proposition that a particular threshold of organization is required for drug dealing to rise to the level of organized crime. Indeed, to the extent that Massachusetts courts have confronted the question, their decisions suggest the opposite, i.e., that drug dealing inherently has a nexus to organized crime. See Commonwealth v. Remedor, 52 Mass.App.Ct. 694, 697 (2001) (“[I]t is reasonable to suspect that any retail street sales of cocaine, even if small in quantify, have a nexus to organized crime”); Clifford S. Fishman & Anne T. McKenna, Wirtetapping & Eavesdropping: Surveillance in the Internet Age, §5:45 at 5-76 (3d ed. 2010) (suggesting that the Supreme Judicial Court “may have accepted the principle that trafficking in narcotics automatically constitutes organized crime”), citing Commonwealth v. Penta, 423 Mass. 546, 551-52 & n.9 (1996).
Furthermore, courts have found reasonable suspicion to conclude that a nexus to organized crime existed even where the scale of organized criminal activity was relatively small. See, e.g., Commonwealth v. Lykus, 406 Mass. 135, 136 & 142 (1989) (kidnapping ransom note written in first-person plural “we” allowed the inference “that a group was behind the kidnapping”); Thorpe, 384 Mass., at 272 (statement by single defendant that police promotion exam available “through an organization headed by a woman”); Commonwealth v. Terzian, 61 Mass.App.Ct. 739, 741-42 & 746 (2004) (one attorney acting in concert with one client to suborn peijuiy from police informant). Compare Remedor, 52 Mass.App.Ct. at 695-97 (two code-fendants involved in efforts to sell cocaine); Commonwealth v. Zuluaga, 43 Mass.App.Ct. 629, 631-34 (1997) (three codefendants involved in efforts to sell cocaine).
In consequence, the concerted efforts of Greene and Yore to sell cocaine to CI-01 provided reasonable suspicion that a wiretap of the target telephone would lead to evidence of a designated offense, cocaine distribution, connected to organized crime, Greene and Yore’s cocaine dealing business. Additionally, CI-01, a credible source of information, told police that Jason DePina was also part of Greene’s drug dealing organization, expanding the scale of the organization.
Moreover, additional information set forth in the affidavit supports probable cause to believe that Greene, Yore, and DePina were working in concert with other members of the Magnolia Street Steelers in furtherance of their cocaine distribution enterprise. Dt. Walsh observed Elias Perea and Jonathan Carter, both believed to be members of the Magnolia Street Steelers, in the car with Greene when Dt. Walsh arrived at the predetermined location for the drug transaction that he arranged by his “cold call” to “Sport.” And, the police knew that the Magnolia Street Steelers generally were involved in drug dealing, and that Perea specifically was involved in cocaine distribution. The toll records on Greene’s cell phones also suggested that individuals in addition to Yore and DePina were involved in the cocaine distribution organization.
Additionally, the affidavit included information that supported a finding that Greene had been involved in the distribution of cocaine for a lengthy period beginning some time prior to August 2008, when the investigation of Greene’s activities that led to the application for the wiretap warrant began.
The police’s uncertainty as to the identities of each member of Greene’s cocaine distribution organization weighed in favor of concluding that the affidavit supported a reasonable suspicion of a nexus to organized *148 crime. Compare Terzian, 61 Mass.App.Ct. at 745 (“[T]he police investigators knew some of the parties who were allegedly involved in the crime, but not all; some remained unnamed and unknown”), and Lykus, 406 Mass. at 142 (“[T]he police lacked ... a clear picture of the players involved in the kidnapping”), with Commonwealth v. Jarabek, 384 Mass. 293, 296 (1981) (efforts of two city councilors, whose identities were known to police, to obtain a single kickback from a contractor, did not create a nexus with organized crime).
In summary, the police had sufficient evidence that Greene, Yore, DePina and others were involved in a continuing, organized conspiracy to distribute cocaine. The affidavit supported an objectively reasonable suspicion grounded in articulable facts from which a person could conclude that a wiretap on the target telephone would lead to evidence of a designated offense in connection with organized crime.
3. Necessity of Wiretap Surveillance
“The sufficiency of the affidavit is to be upheld where the . . . issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared unlikely to succeed.” United States v. Ashley, 876 F.2d 1069, 1074(1st Cir.1989); see also Commonwealth v. Fenderson, 410 Mass. 82, 83-84 (1991) (noting similarities between federal necessity requirement and the Massachusetts necessity requirement, and citing Ashley in construing the Massachusetts necessity requirement).
The affidavit explained in detail the difficulties that the police faced in employing conventional investigative techniques. The countersurveillance measures relied on by Greene and his associates served as an impediment to police surveillance efforts. Greene’s history of violent behavior,[18] as well as that of various other individuals identified in the affidavit, discouraged informants from assisting in investigative efforts and posed a danger to undercover officers, as evidenced by Dt. Walsh’s unsuccessful attempt at making a controlled purchase from Greene. See Commonwealth v. Rosario, Criminal Action No. 08-0596 (Plymouth Super.Ct. Oct. 13, 2010) (Troy, J.) (noting the role of countersurveillance measures and violent reputation in impeding conventional investigative methods), and cases cited.
In addition, the affidavit explained how conventional investigative techniques were unable to identify the upper echelon of the Greene’s drug dealing organization, for example, his source of cocaine. While CI-01 expressed a willingness to make controlled purchases from other members of the Magnolia Street Steelers, that information could not identify members of the conspiracy not already known to police, or connect them to Greene. In addition, no one, including CI-01, was able to identify Greene’s supplier, or volunteered to testify against any subject of the investigation in court. Compare Commonwealth v. Westerman, 414 Mass. 688, 693 (1993) (“inability of informants to reach the leaders of the conspiracy” referenced as reason wiretap was necessary), with United States v. Ippolito, 774 F.2d 1482, 1486-87 (9th Cir. 1985) (suppression justified where informant willing to testify and capable of uncovering entirety of conspiracy). See also United States v. Canales Gomez, 358 F.3d 1221, 1227 (9th Cir.2004) (“The government need not prove that informants would be totally useless").
Also, the affidavit explained the limitations on other methods of investigation, such as telephone toll analysis and trash pulls. Both those approaches had failed to do more than confirm that members of the conspiracy already known to the police were engaged in drug distribution activities; there was no reason to believe that these methods would have uncovered new members of the conspiracy. The fact that conventional investigative techniques had produced some results does not foreclose a wiretap as another avenue of investigation. See United States v. Cartagena, 593 F.3d 104, 110 (1st Cir.2010) (“Even if traditional investigative procedures produce some results, the partial success of the investigation does not mean that there is nothing more to be done”) (internal quotation and alterations deleted); Fenderson, 410 Mass. at 83 (“The Commonwealth need not show that traditional investigative techniques were wholly unsuccessful or that the police had exhausted all other investigative procedures before filing its application for a warrant authorizing a wiretap”).
In addition, Greene engaged in efforts to thwart police analysis of their trash, suggesting that the defendants were aware the police were investigating them and creating the possibility that the investigation would be exposed if use of the same methods continued.
Finally, execution of search warrants or the use of grand jury subpoenas would create the risk of conspirators fleeing or destroying evidence.
In summary, the explanation set forth in the affidavit enabled the issuing court reasonably to conclude that conventional investigative measures had been tried and failed, or appeared unlikely to succeed.
ORDER
For the foregoing reasons, the defendants’ Motions to Suppress Evidence Obtained from Electronic Surveillance are DENIED.

Dt. Waggett’s and Sgt. Brooks’s substantial experience in the investigation of drug-related offenses is set out at length in the affidavit.

There were additional affidavits submitted in support of extensions of the original warrant and follow-on warrants. It is the court’s understanding that the parties agree that these *149 motions turn on the sufficiency of the affidavit submitted in support of the original wiretap.

“Keon Santos’s communications with Detective Brown over the years have exposed his open admissions to being a member of the Magnolia Street Steelers.” “Elias Perea has also openly admitted his active participation with the Magnolia Street Steelers and is very proud of this affiliation.” Aff. 62.

The affidavit does not identify the gender of CI-01; masculine pronouns are used in this memorandum of decision solely for simplicity. The affidavit alleges that CI-01 provided the police with information regarding a location where drugs were being sold. CI-01 participated in controlled purchases of cocaine at that location, which resulted in the issuance of a search warrant. Pursuant to the execution of that search warrant, the police recovered between twenty-eight and 100 grams of cocaine, and approximately $10,000 in U.S. currency. In addition, CI-01 provided information to the police that led to the arrest of two individuals on weapons-related charges. Aff. 36.

Aff. 37.

Id.

Id.

This information was corroborated by booking photographs of Greene, which showed that Greene had multiple tattoos evidencing an affiliation with the Magnolia Street Steelers. “On his upper left arm, Greene has a circle and within this circle are a yellow, red, and blue diamond and the word Steelers. Across his right shoulder, Greene has in large letters MAG, beneath that... is a tattoo of the word Steel.” Aff. 48. “Mag Steel” is a known reference to the Magnolia Street Steelers.

Both of these telephones were pre-paid cellular phones. Drug dealers make use of such pre-paid cellular phones because they do not require contracts with any cell phone company or billing statements, making it more difficult to identify the user of the cell phone. For example, the original Greene telephone was purchased in the name of “John Smith.”

 See Aff. pp.80-83.

Aff. 101.

Aff. 103.

Aff. 109.

Aff. 104.

Aff. 109.

Aff. 12.

See ¶¶42, 48, and 77-99.