**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Augustine A. GALLO,
Defendant-Appellant.**

**No. 80–1775.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 1981.

Decided Oct. 13, 1981.

As Corrected Nov. 4, 1981.

---

William B. Terry, Goodman, Oshins, Brown & Singer, Las Vegas, Nev., for defendant-appellant.

Rimantas A. Rukstele, Las Vegas, Nev., argued, for plaintiff-appellee; Leland E. Lutfy, Asst. U. S. Atty., Las Vegas, Nev., on brief.

Before GOODWIN and NELSON, Circuit Judges, and PRICE *, District Judge.

PRICE, District Judge.

The Defendant/Appellant Gallo was convicted of four counts of attempting to evade or defeat wagering excise taxes (26 U.S.C. § 7201), and one count of failure to file return and pay wagering occupational tax (26 U.S.C. § 7203).

Defendant became the object of an intensive investigation by the Criminal Investigation Division of the Internal Revenue Service (IRS) in October, 1978. Although he was not duly licensed as such in the State of Nevada, Gallo was suspected of bookmaking and failing to comply with the Federal registration requirements and to pay the taxes imposed upon such activity by the United States government.[1]

Investigation of Gallo commenced on approximately October 1, 1978, and continued through the early part of December, 1978. Investigation not only consisted of personal surveillance of Gallo by various agents of the IRS, but also undercover agents were utilized to make direct contact with Gallo and to actually place bets with Gallo. Further, a search of IRS records failed to indicate that Gallo had ever filed a formal Form 11–C (Special Tax Return and Application for Registry—Wager) for the period July 1, 1977 to December 8, 1978.

---

* Honorable Edward Dean Price, United States District Judge for the Eastern District of California, sitting by designation.

1. Although bookmaking is legal in the State of Nevada, the state imposes a registration re-

quirement. It was ascertained at the beginning of the investigation that Gallo had not registered as a bookmaker in the State of Nevada. *See* Nevada Revised Statutes, § 463.160(1)(c).

At the conclusion of the investigation, a search warrant was sought based upon a master affidavit recounting the investigatory activities in great detail. The master affidavit consists of forty-one (41) legal size pages. The search warrant was issued pursuant to this master affidavit and was executed on December 18, 1978.

As a result of the search pursuant to the search warrant, substantial quantities of evidence indicating defendant's bookmaking activities were seized. In addition, the searching agents answered the telephone situated in the bookmaking office being searched approximately twelve (12) times during the course of their activities. On a substantial number of these occasions, the caller was a bettor desiring to place a bet with Gallo.

Prior to his indictment, Gallo filed a motion in district court for the return of his property seized during the raid. His motion was denied by minute order.

After his indictment and arrest, the motion was renewed in the form of a motion to suppress evidence. On this occasion, Gallo also attacked the evidence produced by the agents answering the telephone during the raid. Again the matter was decided adversely to Gallo. The district court filed a memorandum decision and order.

At his trial, where all of the evidence to which he had previously objected was introduced, Gallo admitted his bookmaking activities but claimed ignorance of the law. He was convicted of four counts of attempting to evade or defeat wagering excise tax, and one count of failure to file return and pay wagering occupational tax. He appeals that conviction.

Gallo raises three issues on appeal:

I. Whether the master affidavit established probable cause to believe the defendant was involved in criminal activity;

II. Whether the agents' interception of telephone calls during the search pursuant to the search warrant violated Gallo's constitutional rights; and

III. Whether the government sustained its burden of proof as to the issue of willfulness.

I

*Whether the Master Affidavit Established Probable Cause to Believe Defendant was Involved in Criminal Activity.*

Gallo's main argument in his attack upon the sufficiency of the affidavit is that nowhere is it alleged that he charged or received "vigorish" or "juice" on the bets he accepted.

> Vigorish: 1. A charge taken (as by a bookie or gambling house) on bets; also: the degree of such a charge.

Webster's *New Collegiate Dictionary* (1973).

Gallo expands this argument to assert quite properly that the activity proscribed by the statute does not encompass taking bets "among friends," and is only aimed at the *commercial* bookmaker. *See George v. United States*, 346 F.2d 137 (9th Cir. 1965).

Gallo's contentions are correct as to what constitute the elements of the crime of bookmaking, but overlooks the issue with which we concern ourselves, *i. e.*, did the affidavit show probable cause to believe that criminal activity by Gallo was being carried on by him in the premises described in the search warrant.

■ One only need compare the affidavit found in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)[2]

2. In *Spinelli*, the affidavit in support of the search warrant was found to be insufficient. It consisted of seventeen (17) paragraphs, which described a surveillance that lasted ten (10) days. It also contained a "tip" from an alleged confidential informant that Spinelli, allegedly a known bookmaker, was engaged in bookmaking at the location which Spinelli was observed entering on several occasions. Unlike the instant case, it did not concern a single incident wherein Spinelli was actually observed or overheard plying his illegal trade. The deficiencies of the *Spinelli* affidavit were characterized by the court thusly:

> When we look to the other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into

with the instant master affidavit to recognize immediately that the affidavit in the instant case more than adequately establishes probable cause to believe that federal criminal activity is being engaged in by the person or persons against whom the sought after search warrant is directed.

The search warrant in the instant case was issued by the magistrate after being presented with a "master" affidavit consisting of forty-one (41) legal size pages which set forth in great detail the following facts:

1. The extensive prior experience of the case agent directing the investigation;

2. The mode of operations normally engaged in by bookmakers;

3. The "language" of the professional bookmaker;

4. The prior experience and reliability of the undercover agent used in the investigation;

5. The observations of the undercover agent which consisted of:

(a) The defendant paying several individuals in cash;

(b) The defendant personally clearing a customer who had telephoned the betting parlor;

(c) The defendant instructing callers as to where the caller might pick up his money;

(d) The defendant accepting payoff after consulting his records;

(e) The defendant delivering the betting "line" to several persons who requested it;

(f) The bartenders at Sal Gusso's Bar (a place which the defendant habitually used for his contacts with customers) attempting to place bets and accepting money for delivery to the defendant;

(g) The defendant's acceptance of bets from the undercover agent and the defendant's instructions as to how to place future bets by telephone, including the number to use;

(h) The undercover agent's placing of bets with persons who answered the telephone when the undercover agent placed calls to the numbers furnished to him by the defendant;

(i) The defendant obtaining sports line information from the board at legal betting parlors.

Clearly, the Magistrate had probable cause to issue the search warrant in question. *See United States v. Besase*, 521 F.2d 1306 (6th Cir. 1975); *United States v. McNally*, 473 F.2d 934 (3rd Cir. 1973); *United States v. Berry*, 463 F.2d 1278 (D.C.Cir. 1972).

II

*Whether the Agents' Interception of Telephone Calls During the Search Pursuant to the Search Warrant Violated Gallo's Constitutional Rights.*

■ As previously indicated, the searching agents answered the telephone on numerous occasions during the search. In many instances the caller was a prospective bettor who desired to place a bet with the defendant's "book."

Gallo argues that the search warrant did not authorize this particular seizure, and that in order to answer the phone that matter should have been included within the description of the items to be "seized" pursuant to the search warrant.

The government argues that this argument is mooted because Gallo's counsel in his opening statement admitted that he was a bookmaker.

Gallo counters with the claim that this decision re trial tactics was dictated by the failure of the court to suppress the evidence seized pursuant to the search warrant, including the telephonic conversation.

Gallo's contention that the search warrant did not authorize "seizure" of incoming telephone calls was answered in *United States v. Fuller*, 441 F.2d 755 (4th Cir. 1971) *cert. denied*, 404 U.S. 830, 92 S.Ct. 73, 30 L.Ed.2d 59 (1971). At page 760, the *Fuller* court stated:

a judgment that a crime was probably being committed.

*United States v. Spinelli*, 393 U.S. 410, 418, 89 S.Ct. 584, 590, 21 L.Ed.2d 637, 645 (1969).

In this case, the warrant authorized searching for and seizing "bookmaking records and wagering paraphernalia consisting of, but not limited to, accounting sheets, rundown sheets, betting slips, recap sheets, sports information papers, miscellaneous line notations, line sheets, books of account, checks, money orders, and United States Currency * * *." The description is necessarily general and clearly contemplates that material relating to gambling activity but not precisely described might be seized. The intent of the generalized description is clearly to permit the seizure of any items directly related to the appellants' booking operation. The telephone calls answered by the agents were clearly a part of appellants' booking operation and, therefore, we think within the scope of the general language of the warrant.

In *United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979), it appeared that during the execution of the search warrant the agents seized certain ledgers which contained records properly described in the warrant as being the object of the search. The ledgers also contained other incriminating evidence not described in the search warrant. Defendants objected to the seizure of the material that was not specifically described. The Ninth Circuit panel dismissed the defendant's objections, stating:

> As long as an item appears, at the time of the search, to contain evidence reasonably related to the purposes of the search, there is no reason—absent some other Fourth Amendment violation—to suppress it. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642 [1650], 18 L.Ed.2d 782 (1967). The fact that an item seized happens to contain other incriminating information not covered by the terms of the warrant does not compel its suppression, either in whole or in part.

Admittedly, an incoming telephone call cannot "appear" to contain relevant evidence until it is received. However, logic compels the conclusion that the telephone is a highly necessary accessory to the business of bookmaking. Incoming telephone calls were the source of many of the betting slips described in the warrant, as well as the other records of betting transactions.

We now consider whether the "seizure" of the telephone calls constituted "other Fourth Amendment violations."

The prior authority of the circuit on the legality of intercepting telephone calls is *Seeber v. United States*, 329 F.2d 572 (9th Cir. 1964). *Seeber*, of course, was decided prior to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Title 18, U.S.C. §§ 2510–2520. Because of this, Gallo argues that its precedential value is destroyed, and this circuit should re-examine the holding in *Seeber* that a law enforcement officer who answers a ringing telephone while lawfully on the premises did not unlawfully "intercept" the message under the then existing law.

In *United States v. Campagnuolo*, 592 F.2d 852 (5th Cir. 1979), a panel of the Fifth Circuit considered this precise point at length. There the agents were on the premises pursuant to a search warrant, *reconnected* a previously *disconnected* telephone, and proceeded to answer forty-two (42) calls. The trial judge below had specifically held that such conduct violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, and excluded the evidence on that and other grounds.

The Court of Appeals carefully reviewed all of the existing federal and state authority on the subject, including cases that predated the aforesaid Title III. The *Campagnuolo* court clearly held, and we agree, that Congress intended to reaffirm the result of prior cases making admissible communications to which a police officer is a part. Hence, we reject Gallo's contentions in this regard; there being neither an unlawful "seizure" of the telephone calls nor other Fourth Amendment violations.

Since the evidence which was obtained from the intercepted telephone calls was properly before the jury, we need not further consider Gallo's complaint that but for that particular evidence, he would not have conceded at trial that he was engaged in bookmaking. It should be noted that there

was considerable other evidence of the nature of Gallo's activities which would have supported the jury's verdict.

## III

### *Whether the Government Sustained Its Burden of Proof As to the Issue of Willfulness.*

██ We analyze defendant's last contention in the light of *Spies v. United States,* 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1942). *Spies, supra,* illustrates various types of evidence that might support a finding of willfulness in the context of the Internal Revenue statutes which require voluntary filing of income tax returns, and the payment of any tax due thereon. In *Spies,* the court observed:

Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

In this case there are several items of evidence, apart from the default in filing the return and paying the tax, which the Government claims will support an inference of willful attempt to evade or defeat the tax. These go to establish that petitioner insisted that certain income be paid to him in cash, transferred it to his own bank by armored car, deposited it, not in his own name but in the names of others of his family, and kept inadequate and misleading records. Petitioner claims other motives animated him in these matters. We intimate no opinion. Such inferences are for the jury.

*Spies v. United States,* 317 U.S. 499, 500, 63 S.Ct. 364, 368, 87 L.Ed. 418, 423 (1942).

We transpose that analysis to the instant case. In doing so, we note the evidence established that:

1. Gallo is engaged in illegal activity in the State of Nevada.

2. All records that Gallo did keep were kept in code.

3. In the short period of time involved in the surveillance, Gallo operated out of three different locations.

4. Gallo listed the telephones in question under a fictitious name.

5. Within the relatively short time in question, Gallo moved the phones from one location to another.

6. Unlike legitimate, licensed bookmakers in the Las Vegas area, Gallo did not give his customers receipts for bets placed with him.

7. Gallo not only kept his own records in code, he required his customers when calling in their bets to use codes for both their names and numbers.

8. Gallo operated only on a cash basis.

In summary, Gallo's operation was practically a text book model of how a surreptitious bookmaking operation should be conducted.

Accordingly, we affirm the defendant's conviction.