**UNITED STATES of America, Plaintiff,**

v.

**Chong In KIM, Defendant.**

**Crim. No. 92–00063 HMF.**

United States District Court,
D. Hawaii.

May 1, 1992.

Daniel A. Bent, U.S. Atty., Florence T. Nakakuni, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff.

Joseph Gedan, Honolulu, Hawaii, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FONG, District Judge.

### INTRODUCTION

On April 17, 1992, the court held a hearing on defendant's amended motion to suppress evidence and statements filed on April 10, 1992. Defendant filed a supplemental memorandum in support of his motion on April 15, 1992. Plaintiff filed a response on April 15, 1992.

### DISCUSSION

Because there were three distinct encounters with law enforcement in this case, the court will break the discussion into these three specific time periods; the events of November 13, 1991; the events of December 27, 1991; and the events of December 29, 1991. The findings of fact and conclusions of law will be discussed separately for each encounter.

### I. EVENTS OF NOVEMBER 13, 1991.

#### A. *Findings of Fact.*

1. It is known to DEA that methamphetamine or "ice" is prevalent in certain parts of town which are predominantly Korean and DEA's "Ice Task Force" has made many arrests in these areas. Testimony of Agent Aiu.

2. DEA agents had received confidential information that a male Korean, in possession of several ounces of ice, would be in the area of the Chun Soo Herb Center at 808 Sheridan Street in Honolulu (the "Herb Center") on November 13, 1992. Accordingly, three members of the Ice Task Force conducted a surveillance of the area on that date. Testimony of Aiu.

3. At approximately 5:00 p.m. agents observed a number of cars and Korean individuals in front of the Herb Center. In particular, the agents observed a Korean individual (later identified as the defendant, Chong In Kim) and an individual who appeared to be part Hawaiian (later identified as Stewart Machado), exit from an adjacent luggage store. Machado was carrying a suitcase and proceeded to place it in the trunk of a 1991 Lincoln Continental Towncar which was parked in front of the luggage store. Machado then entered the drivers side and Kim entered the passenger side of the car. Testimony of Aiu; testimony of Kim.

4. Agent Aiu approached the drivers side of the car, identified himself as a DEA Agent, and asked permission to ask Machado some questions. At this time, Agent Aiu's car was parked so as to partially block the Lincoln Continental Towncar which was parked in one of the Herb Center's perpendicular parking spaces. Testimony of Aiu.

5. Agent Aiu asked to see Machado's drivers license. Machado responded that his name was Stewart Machado but that he didn't have a drivers license. Agent Aiu then informed him that it was a violation of

state law to operate a vehicle without a license. Testimony of Aiu.

6. Aiu asked Kim for identification and Kim responded that his name was "Mr. Oh." Kim started to open a wallet to display a Hawaii driver's license, but then stopped and told Aiu that the license in the wallet was not his, but belonged to a friend named Chang Su Oh. Testimony of Aiu; testimony of Kim.

7. At this point, Agent Aiu asked both individuals to step out of the car so he could further question them. Agent Aiu spoke with Kim, while other agents spoke with Machado. Testimony of Aiu.

8. One of the other agents asked Machado if they could look in the trunk of the car. Machado looked over to Kim, and Kim indicated that they could. One of the officers opened the trunk and found a suitcase inside. The suitcase was opened and found to be empty. Testimony of Aiu; testimony of Kim.

9. Aiu asked Kim if he knew anything about ice and Kim responded that he did not. Aiu then asked if Kim had ever smoked ice, and Kim responded that he used to, but no longer did. Testimony of Aiu.

10. Aiu then asked Kim what was in his pants pocket. Kim stated that it was a lighter. When asked to remove it, Kim removed a silver container from another pocket. Aiu asked if he could look inside and Kim assented. Testimony of Aiu.

11. Inside, Aiu found several grams of crystal methamphetamine. Aiu asked what it was and Kim responded that it was ice. Testimony of Aiu.

12. At this point, Kim indicated that he wanted to speak to Aiu alone. Kim and Aiu moved behind a van which was out of view of the front of the store. Kim told Aiu that he wanted to cooperate with Aiu and that he could provide valuable information concerning larger shipments of crystal methamphetamine. Testimony of Aiu.

13. Aiu stopped Kim during this statement and advised him of his constitutional rights. Aiu stopped after each phrase and asked if Kim understood, and Kim indicated that he did. Kim agreed to speak to Aiu without an attorney. Testimony of Aiu.

14. Kim stated that he wanted to speak with the agents at another location since continued conversation on the street would attract attention. Aiu then directed Kim to drop Machado off and meet him at the Likelike Drive Inn. Testimony of Aiu.

15. Machado and Kim then drove off in the Lincoln Towncar followed by other federal agents. These agents informed Aiu that the vehicle had stopped at the Likelike Drive Inn, dropped Kim off, and had driven away. Aiu, believing that the vehicle had been used to transport crystal methamphetamine advised the agents to stop it and seize it for forfeiture under the federal forfeiture statute.

16. Shortly after the vehicle was seized, Aiu and another agent, Craig Williams, drove to Likelike Drive Inn. They met Kim inside and told him that they would take him to the DEA Resident Office in the Federal Building and speak with him there. At this point, Kim was under arrest. Testimony of Aiu.

17. Aiu reprimanded Kim for not following directions. Kim responded that he had misunderstood. Testimony of Aiu; testimony of Kim.

18. Once at the Federal Building, Kim was told to remove his jacket and empty his pockets. At this point, Kim surrendered a pouch containing another 86.5 grams of ice to the agents. Testimony of Aiu; testimony of Kim.

19. Kim then provided a written statement to the DEA which detailed his involvement in the sale of crystal methamphetamine. The agents interviewed Kim in order to get the information that was to go in the statement. The statement was not recorded verbatim, but was a summary of the major points. Kim was then asked to read the statement and sign off on it. Testimony of Aiu.

20. Kim has subsequently reread the statement and has indicated that there were several words in the statement that he did not understand. Defendant's Exhibit 2a.

21. Kim agreed to further cooperate with the agents and was later released. Testimony of Aiu; testimony of Kim.

22. While Kim was speaking to the agents, his car was inventoried and the following items found: a .380 semi-automatic pistol; a .38 caliber revolver; a small packet of methamphetamine inside a briefcase; a small amount of cocaine; and a small amount of marijuana. Testimony of Aiu.

### B. *Conclusions of Law.*

The defense asks that all items and statements from the November 13, 1991 stop be suppressed.

#### 1. Initial Stop.

■ Defendant first argues that the court should find the initial stop to be an illegal race-based stop. It is true that an individual cannot be stopped simply on the basis of a universal description of a particular race. *See United States v. Mallides,* 473 F.2d 859, 861 (1973) (In reference to Mexican individuals, the court noted that "[t]he conduct does not become suspicious simply because the skins of the occupants are nonwhite or because they sit up straight or because they do not look at a passing police car.").

■ In this case, the defendant argues that the description given to the agents was merely a generic description of a Korean male and, therefore, that they had no legitimate reason to stop him. This is not entirely the case, however. The officers had a relatively detailed description of the site of the anticipated drug transaction and the date on which it was to occur. In addition, although there were a number of Korean individuals located nearby, the officers chose to stop only Kim (a Korean) and Machado (a Hawaiian mix) upon their emergence from the luggage store. In light of these facts, particularly the fact that Machado was stopped as well as Kim, the court finds that the initial stop was not an improper race-based stop.

#### 2. Consent for Initial Search.

■ Defendant's next argument relates to Kim's showing the 7.5 grams of ice to Agent Aiu shortly after the initial stop. The government claims that this was a consensual search of the contents of the silver container. Defendant, on the other hand, contends that he had no choice but to give up the drugs because he had been seized by the agents.

Under *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court described the standard used for determining whether a person had been seized within the meaning of the Fourth Amendment:

> [A] person has been seized within the meaning of the Fourth Amendment only if, in the view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554–55, 100 S.Ct. at 1877 (footnotes and citations omitted).

In this case, Kim claims that he had no choice but to show the agent the contents of his pocket because he had been effectively seized. To bolster this position, Kim cites the following facts: (1) he and Machado were surrounded by a number of DEA Agents, (2) his car was blocked by one of the agents' cars; (3) although no guns were visible, Kim knew that such agents were generally armed; (4) Kim felt that he was not free to leave; and (5) he had not been informed that he had the right to refuse the agent's request.

The government, on the other hand, cites the following facts to support its position that Kim was not seized: (1) no weapons were visible; (2) Kim's car was not completely blocked; (3) only one agent was talking to Kim; (4) there was no physical contact save a light touch of defendant's pocket; and (5) the tone of the interview was not coercive.

The court agrees with the government. Given the totality of the circumstances, the court cannot fault the agents' approach. In fact, it is unclear what more could have been done to make the interview less threatening. The court finds, therefore, that Kim voluntarily showed the agent the ice within the silver container following the request.

### 3. Seizure of Car and Contents.

The government claims that the automobile was lawfully seized pursuant to federal forfeiture law. 21 U.S.C. § 881 provides that:

> (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them: ...
>
> (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [a controlled substance].

Such a vehicle may be seized if there is "probable cause to believe that it was used 'to facilitate the transfer of contraband.'" *United States v. Johnson*, 572 F.2d 227, 234 (9th Cir.1978), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978) (quoting *United States v. La Vecchia*, 513 F.2d 1210, 1216 (2d Cir.1975).

■ The court finds that the seizure of the vehicle was proper under the law. After the agents had recovered the crystal methamphetamine from the defendant, they had probable cause to believe that the car had been used in the transportation or possession of crystal methamphetamine.

■ Furthermore, once the car was lawfully seized, it was properly searched accordingly to standard inventory proce-dures. As a result of this search, more contraband was found, including a .380 semiautomatic pistol, a .38 caliber revolver, a small packet of methamphetamine inside a briefcase, a small amount of cocaine, and a small amount of marijuana. The court will therefore DENY defendant's motion to suppress these items.

### 4. 86.5 Grams of Ice at DEA Office.

■ The 86.5 grams of ice were surrendered at the DEA office where defendant was arrested. Given that the court has found the original surrender of the 7.5 grams of ice in front of the luggage store to be legal, there was clearly probable cause to arrest the defendant for a drug related crime. Accordingly, the court finds that this additional contraband was lawfully seized pursuant to a valid arrest and, therefore, will not be suppressed.

### 5. Statement Given on November 13, 1991.

■ With respect to the statement given to the agents on November 13, 1991, defendant argues that he was not properly advised of his rights. Defendant argues that Korean is his first language and, although he knows some English, he did not understand enough to be fully apprised of his rights. Specifically, defendant has submitted a marked copy of the statement, in which he has circled all the words that he did not understand. Of concern to the court is the fact that, on the last page of the statement, defendant has circled a large number of words. The following is a comparison of this section, first omitting the words that Kim claims he does not understand, and then as written, with the words that Kim claims he did not understand underscored:

> I have read the ... statement ... of three typewritten pages. I have ... each page and all ... and that it is true and ... to the best of my ... and ..., and that I gave this statement ... and ... without ..., ..., or ... of reward. I have read the *foregoing* statement *consisting* of three typewritten pages. I have *initialed* each page and all *correc-*

*tions* and that it is true and *correct* to the best of my *knowledge* and *belief,* and that I gave this statement *freely* and *voluntarily* without *threats, coercion,* or *promises* of reward.

From this comparison, it is clear that defendant did not understand the last phrase, referring to the absence of threats or coercion. In addition it seems that the defendant did not understand the portions relating to his initialing of each page and inserting corrections. Accordingly, the court is unable to ascertain whether the defendant knew that he had the right to make corrections if he found an inaccuracy—in fact, no corrections were made. This is particularly troublesome in light of the fact that Kim later indicated that there were several words in the substantive body of the text that he did not understand.

The court notes that the burden is upon the government to demonstrate the accuracy and voluntariness of a statement. The court finds that there was sufficient evidence presented to demonstrate that the statement was voluntary. However, given the defendant's limited understanding of English—which the court has observed and evaluated—the court is not persuaded that defendant was adequately informed of his right to make corrections to the statement the agents had prepared. The court finds, therefore, that sufficient doubt has been cast with respect to the overall accuracy of the statement as to render it inadmissible at trial.

## II. EVENTS OF DECEMBER 27, 1991.

### A. *Findings of Fact.*

1. Following Kim's release from the DEA office, the government made attempts to contact Kim through his beeper. At one point, Kim informed the agents that he was too sick to come it. The government claims that Kim refused to come in to speak with them and that he was backing out of his offer of cooperation. Kim, on the other hand, claims that he was actively trying to cooperate, that he left several messages, but that the agents never invited him to come in, except on one occasion when he really was too sick.

The court finds no reason to disbelieve either version, and finds the stated perception of each side to be true. Therefore, the court finds that although Kim was willing to cooperate, he was never given the opportunity to do so because of either miscommunications, bad timing, the language barrier, or a combination of all three. In any case, as a result, the government came to believe that Kim was no longer intending to cooperate with them. Testimony of Aiu; testimony of Kim.

2. On December 27, 1991, Honolulu Police Department Officer Lovell was working as a narcotics officer at the airport. He received a call that two individuals were attempting to purchase one way tickets with cash. Testimony of Lovell.

3. Officer Lovell then went to investigate, along with officers Uehara and Krajewski. They approached Kim and his companion, who later was identified as Mr. Rellin. Neither Kim nor Rellin appeared to have any luggage. Upon their approach, Rellin walked away from Kim. Officer Uehara approached Kim, while officers Krajewski and Lovell approached Rellin.

The officers identified themselves and asked permission to ask some questions. Kim and Rellin consented. Testimony of Lovell, Krajewski and Uehara.

4. Officer Uehara asked Kim why he had so much money in 100 dollar bills. Kim seemed nervous and tried to put the money back into his pocket. He responded that he had the cash because was going to Las Vegas to gamble. When asked for his identification, Kim identified himself as Peter Kim and said that he had left his identification outside in his taxi. Uehara did not see a taxi and asked Kim to show him where it was. Kim was unable to do so. Testimony of Uehara.

5. Rellin initially denied knowing Kim and claimed that he was helping him exchange a ticket. However, when the officers asked to see his ticket, it was discovered that he possessed a ticket in the name of P. Kim. When asked for his name, Rellin gave the name of John Gouvierra (phonetic). When asked to spell it, he hesitated for

several seconds and then misspelled the name he had recited. Rellin claimed that he was going to Los Angeles to go shopping. Testimony of Krajewski.

6. After conferring, the officers found that the statements between the two individuals were inconsistent. This, in combination with the profile factors, lead them to believe that the two individuals were possible drug couriers. Testimony of Lovell.

7. At this point, the two were escorted down to the airport police office. Kim was given a waiver to have his person searched and was asked to read it out loud. He did so and then signed it. The officers then removed a large amount of cash found in a number of Kim's pockets. The officers also found that Kim was carrying a cellular telephone. Testimony of Lovell.

8. Lovell placed a call to Howard, an agent with the DEA, and it was determined that the case was assigned for potential federal prosecution. A decision was then made to proceed with a forfeiture action of the money and the telephone and both were seized. Testimony of Lovell.

9. A computer check at the airport office indicated that there were outstanding traffic warrants for Kim. However, when it was determined that the case was federal, Kim was transferred to the Federal Building, and the money and phone were turned over to agent Howard. Testimony of Lovell.

10. Once at the federal building, Kim was held in custody while Howard attempted to confirm the outstanding state warrants. Testimony of Howard.

11. Howard advised Kim of his Miranda rights and had Kim read the rights form outloud. Kim did so and indicated that he understood. He further indicated that he didn't want an attorney and that he was willing to talk. Howard then prepared a typewritten statement for Kim to sign. As with the first statement, this statement was a nonverbatim transcription of Howard's interview with Kim. Kim read and signed the final version. Testimony of Howard.

12. Ultimately, Howard was unable to confirm the state warrants and Kim was again released. Testimony of Howard.

B. *Conclusions of Law.*

█ Kim urges that this second statement be suppressed on substantially the same grounds as the first statement—that he was not adequately informed of his rights. With respect to the voluntariness of the statement, the court is satisfied that, given Howard's care to require Kim to read the *Miranda* rights form back to him and to indicate that he understood each one, Howard adequately performed his duty to inform defendant of his rights.

█ Again, however, the court notes that this statement contains the same boilerplate final paragraph as the November 13, 1991 statement which this court found insufficient in light of defendant's limited understanding of English. In the absence of additional evidence demonstrating that Kim truly was informed of his right to make corrections, the court finds that the government has not sufficiently proven the accuracy of the statement to support its admissibility at trial.

Accordingly, the court will suppress the statement given by defendant to officer Howard on December 27, 1991.

III. EVENTS OF DECEMBER 29, 1991.

A. *Findings of Fact.*

1. On Sunday, December 29, 1991, Agent Howard initiated the processing of the money and cellular telephone seized from Kim. Howard activated the telephone, knowing that cellular telephones display their phone numbers when activated. Testimony of Howard.

2. Within several minutes of activating the phone, it rang. Howard answered the call and a female Asian-speaking individual who identified herself as Hannah asked for Kim. When Howard told her Kim was not there, she hung up. Testimony of Howard.

3. Shortly thereafter, the phone rang again. Howard again answered the phone. This second call was from a Korean male who told Howard that he was Kim's broth-

er from Seattle. Howard responded that he was a friend of Kim's and that Kim was asleep because he had not slept for four days. The caller told Howard that he was trying to reach Kim as Kim was to advise him of the location of a hotel room in Honolulu. The caller further stated that his delivery man would be in Honolulu in 5 or 6 hours and that Kim was to provide hotel information. Agent Howard, believing that a narcotics deal would soon take place told the caller that all the money had been counted and was ready. The caller asked "how much money?" and Howard declined to answer specifically, stating only that all the money was ready. Testimony of Howard.

4. Howard then contacted Agent Aiu and told him of this phone conversation. Based on this phone call and on the previous information given by defendant, the agents believed that a distribution of crystal methamphetamine was about to take place in Honolulu. Through a confidential source, the agents learned that Kim was staying at the Outrigger Phoenix Hotel in Room 1401 or 1402. Testimony of Howard.

5. The agents then proceeded to the hotel and found that Room 4004, in the penthouse, was registered in the name of Desiree Machado. They knew that Stewart Machado, the individual in the company of the defendant on November 13, 1992 was married to a female named Desiree Machado. They also knew that both Machados had been involved in the trafficking of crystal methamphetamine in the past in the Honolulu area. Accordingly, they proceeded to the penthouse of the hotel. Testimony of Howard; testimony of Aiu.

6. Earlier that day, Jolie Menchavez, a friend of Kim's, had gone to meet Kim at a hotel room in Waikiki. When she arrived, Stewart Machado, his wife and a little girl were with Kim. Kim was very sick—he was coughing and holding his chest and stomach and he appeared to be weak and tired. He also seemed to have difficulty listening when they talked with him. They discussed Kim's health and decided to get a room for him so that he could rest. Testimony of Menchavez.

Stewart, Kim and Jolie then went to Room 4004. Stewart remained to talk to Kim for 10–15 minutes and then left the room. Testimony of Menchavez; testimony of Kim.

7. Kim then went into the bathroom to take a shower and emerged wearing a towel. He ate a little soup and then went under the covers of the bed and fell asleep. Testimony of Kim; Testimony of Menchavez.

8. About 1½ hours later the phone rang. Menchavez answered the phone and the caller asked for Stewart. She replied that Stewart wasn't there. The ringing of the phone did not wake Kim up. Menchavez tried to wake him up after the phone call, but he did not wake up. Testimony of Menchavez.

9. It was at this time that the agents arrived at the hotel room and knocked at the door. Menchavez asked who it was and a voice asked if "Stu" was there. Menchavez said "no." Then, the agents told her that they were the police and that she had to open the door. Menchavez tried to wake Kim up. While she was doing so, the agent told her to open the door or they would have to "bust it down." Again, Menchavez tried to wake Kim up; he started to rouse, but appeared disoriented.

The agents again requested that Menchavez open the door. Menchavez told Kim that the police were at the door and that she would have to open it. Testimony of Menchavez.

10. Menchavez opened the door and stepped back from the doorway. Four officers came in, all with weapons drawn. Three immediately surrounded Kim. One of the agents pointed his gun at Kim and told him to get up. Kim started to get out of the bed. He was naked. The agent lifted him up, hit him on the side of his body, pushed him against the wall, and handcuffed him. During this time, the agent was yelling and swearing at Kim.

Menchavez was taken into the hall and from there she heard struggling, a slapping sound, and then the sound of someone

being slammed against the wall. Testimony of Kim; Testimony of Menchavez.

11. Kim asked if he could put his clothes on, but the agents hit him again. The agents then searched the immediate area and found a loaded pistol under the mattress; a glass pipe with ice residue; and several shotgun shells. They also found a briefcase under the bed containing $85,000. Testimony of Kim; testimony of Aiu.

12. At some point, Kim was allowed to put his pants on. Testimony of Aiu.

13. Following the search of the immediate area, the agents presented a consent to search form to Kim and told him to sign it. Kim signed the form because he didn't want to be further injured. Testimony of Kim.

14. As a result of this search, the agents found 348.1 grams of ice in a cardboard box under the bed. Testimony of Aiu.

15. Kim was then arrested and signed a third statement on December 30, 1991. Testimony of Aiu.

B. *Conclusions of Law.*

1. Seizure of Cellular Telephone.

■■■ Defendant first contests the initial seizure of the cellular telephone. The government argues, however, that the telephone was seized pursuant to the applicable federal forfeiture statute. The court notes that the telephone could be lawfully seized pursuant to 21 U.S.C. § 881(a)(2). That section provides that the following is subject to forfeiture:

> (2) All raw materials, products, and *equipment of any kind* which are *used, or intended for use, in* manufacturing, compounding, processing, *delivering, importing, or exporting* any controlled substance in violation of this subchapter.

21 U.S.C. § 881(a)(2) (emphasis added).

The court finds that, given the circumstances of the airport arrest in combination with the other information that DEA already knew about Kim, they had probable cause to believe he was involved in dealing drugs. The DEA also knew that the cellular telephone was Kim's only means of communication and, therefore, they had probable cause to suspect that the telephone was "equipment used in the delivery, importation or exportation" of controlled substances. Accordingly, the court finds that the seizure of the telephone under federal forfeiture law was proper.

2. Interception of Calls.

Defendant next argues that it was improper for Agent Howard to intercept the two calls from defendant's cellular telephone following its seizure. The court agrees. Following the passage of the Electronic Communications Privacy Act of 1986 ("ECPA"), cellular telephone communications have enjoyed the same privacy protections as standard telephone communications. The Court of Appeals for the Eleventh Circuit explained the effect of the ECPA in *United States v. Carrazana*, 921 F.2d 1557, 1562 (11th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 191, 116 L.Ed.2d 152:

> In 1968, Congress preempted the field of interception of wire and oral communications by enacting Title III of the Omnibus Crime Control and Safe Streets Act, Pub.L. 90–351, 82 Stat. 212 (1968) (codified at 18 U.S.C. § 2510 *et seq.*). In 1986, Congress enacted the "Electronic Communications Privacy Act of 1986," Pub.L. 99–508, 100 Stat. 1848 (1986) ("ECPA"). The ECPA amended Title III to protect cellular communications from interception without prior judicial approval.

Accordingly, unless the government can point to some clearly articulated exception to the general warrant requirement, the instant interceptions, which were accomplished without a warrant, must be suppressed.

The question of whether officers can answer a cellular telephone seized pursuant to federal forfeiture law appears to be a case of first impression. The closest analogous line of cases involves the situation where police officers, who are searching a house pursuant to a search warrant, answer the telephone. In these cases, a suspect's telephone may be answered if such is

within the apparent scope of the search warrant.

In *United States v. Gallo,* 659 F.2d 110 (9th Cir.1981), for example, the Ninth Circuit found that officers searching the residence of an alleged bookmaker could lawfully answer a ringing telephone within the premises. The court adopted the rationale expressed by the Fourth Circuit in *United States v. Fuller,* 441 F.2d 755 (4th Cir. 1971), *cert. denied,* 404 U.S. 830, 92 S.Ct. 73, 74, 30 L.Ed.2d 59 (1971), and quoted from that decision as follows: " 'The telephone calls answered by the agents were clearly a part of appellants' booking operation and, therefore, we think within the scope of the general language of the warrant.' " *Id.* at 114 (quoting *Fuller,* 441 F.2d at 760).

In *United States v. Ordonez,* 737 F.2d 793 (9th Cir.1984), this principle was further explained and applied to a search of the house of a cocaine dealer:

In *United States v. Gallo,* 659 F.2d 110 (9th Cir.1981), we held that an officer may intercept telephone calls while executing a search warrant if the calls are reasonably related to the purpose of the search. 659 F.2d at 114. We held in *Gallo* that the search warrant need not specifically authorize telephonic interceptions where the telephone is 'highly necessary' to the illicit business conducted on the premises. *Id.* at 114. In *Gallo* we were concerned with telephone calls made to a bookmaking establishment. It is clear to us that the telephone is highly necessary to an unlawful organization selling cocaine out of private residences.

*Id.* at 810.

 The general rule that emerges from these cases is that when agents are conducting a legitimate search pursuant to a warrant, they may intercept telephone calls if such is within the scope of the search as set forth by the terms of the warrant.

 Unlike the above cases, however, in this case, no such search was authorized—the cellular telephone was seized pursuant to a civil forfeiture statute. As a result, the *Gallo* rationale is simply inapplicable. The purpose of the instant seizure was to obtain and hold the property pending a forfeiture proceeding—it was not seized for any investigatory purpose. Accordingly, one cannot draw any inference from the legal justification for the seizure to authorize the interception of telephone calls.

If the police saw the need for such an investigatory tool, they had more than enough opportunity to obtain a warrant—the calls were intercepted more than two days following the seizure. The fact that the telephone fortuitously rang shortly after Agent Howard turned it on to identify the number does *not* provide an exception to the general warrant requirement.

The government contends that their action falls within an exception to the warrant requirement because Agent Howard was actually a party to the conversations. Under 18 U.S.C. § 2511(2)(c),

[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

However, the government's position severely strains the scope of this section. This section was designed to take legitimate undercover work outside the scope of the wiretapping statute. The instant claim goes much further. Here, the government claims that any time an officer answers a telephone call, it would fall outside the protection of the wiretapping statute. If this was the correct interpretation, then the police would be able to freely tap into lines and answer calls known to be directed at other parties so long as they were participants in the conversation. Clearly such a broad exception was not intended by section 2511(2)(c).

In this case, Agent Howard was not involved in undercover work to the extent that the caller was attempting to reach officer Howard, or to the extent that a legitimate party to the conversation had authorized Howard to answer the phone.

Rather, Howard simply intercepted a call that was directed to Kim. This situation is clearly distinguishable from the undercover officer who gives a telephone number to a suspected drug dealer in order to consummate an undercover buy.

■ In sum, the court finds that Howard's interception of the incoming telephone calls without a proper warrant was an illegal interception. Accordingly, everything which flowed from the contents of the conversation must be suppressed as "fruits of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). The court finds that the contents of the hotel room and the subsequent statement of Kim qualify as such "fruits" and will, therefore, be suppressed under *Wong Sun*.

### 3. Entry into Room and Subsequent Search.

Even if the court had held the telephone interception to be proper, however, the above evidentiary items are independently suppressible as the result of the officers' nonconsensual entry and search of the hotel room. The government relies on the parties consent for both the entry into the hotel room and for the search.

■ With respect to the entry into the room, the officers claim that they requested permission to enter and that Jolie Menchavez expressed consent by stepping back from the doorway after opening it. The court does not subscribe to this interpretation and finds that Ms. Menchavez' step back from the doorway, after hearing threats that the agents intended to break the door down, and after observing armed police officers with weapons drawn, was *not* tantamount to consent.

■ The government claims that they could properly perform a search of the immediate area for weapons and contraband upon entering the room. This would be correct if the officers had had legitimate authority to enter in the first place, however, because the court has found that the entry, itself, was improper, the fruits of

the immediate search must be suppressed as well.

■ Next, the government claims that Kim signed a consent to search form which allowed the agents to further search the room. In light of the circumstances, however—including the fact that Kim was naked, handcuffed, quite ill, and surrounded by four armed police officers who had struck him and swore repeatedly at him—the court finds that Kim's signature on the consent to search form was not voluntary. Accordingly, the results of this second search must be suppressed as well.

Finally, the court finds that Kim's subsequent statement made on December 30, 1991 must be suppressed as a fruit of the unlawful entry and search of the hotel room.

### 4. Other Grounds for Suppression.

Because the court has already found that all evidence obtained following the intercepted phone call must be suppressed on two independent grounds, the court finds it unnecessary to consider the other grounds for suppression raised by defendant. The court, therefore, makes no rulings at this time with respect to any additional and alternative grounds for suppression that Kim may have raised.

### CONCLUSION

The court will suppress the statements made by Kim on November 13, 1991 and on December 27, 1991 because the government has failed to demonstrate that they are sufficiently accurate in light of Kim's limited understanding of English. The court will also suppress all items found in the hotel room on December 29, 1991 and Kim's subsequent statement on December 30, 1991 as fruits of an improperly intercepted telephone communication or, alternatively, as fruits of a nonconsensual entry into and search of the hotel room in violation of the Fourth Amendment.

The court, however, DENIES the motion to suppress the several grams of crystal methamphetamine voluntarily surrendered to DEA Agent Aiu at Sheridan Street on November 13, 1991 as well as the 86.5

**364**

grams of ice surrendered to DEA agents at their office in the Federal Building later that day. Additionally, the court DENIES the motion to suppress the contents of the automobile recovered following its seizure on November 13, 1991.

IT IS SO ORDERED.